## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 19-cr-103 (3) (MJD/ECW)

      Plaintiff,

    v.                                  **REPORT AND RECOMMENDATION**

KEVIN GREEN (3),

      Defendant.

This matter is before the Court on Defendant Kevin Green's Motion to Suppress Evidence Obtained as a Result of Search and Seizure and for Franks Hearing ("Motion to Suppress") (Dkt. 258) and Defendant Kevin Green's Motion for Relief from Prejudicial Misjoinder or, in the Alternative, for Severance (Dkt. 266). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

Justin A. Wesley, U.S. Attorney's Office, appeared on behalf of the United States of America ("the Government"); Rick E. Mattox appeared by remote means on behalf of Defendant Anthony Akemu Abari, who was present by remote means at the hearings; and Robert D. Richmond appeared on behalf of Defendant Kevin Green, who was present at the hearings.

## I.     PROCEDURAL BACKGROUND—MOTION TO SUPPRESS

Green seeks to suppress the following as part of his Motion to Suppress:

1.     All location data obtained with respect to a cellphone using telephone number 612-263-12XX, authorized by a tracking warrant issued on

March 6, 2019 and extended on May 1, 2019;

2.    All location data obtained with respect to a cellphone using telephone number 612-219-98XX, authorized by a tracking warrant issued on June 11, 2019;

3.    All location data and the fact of the order itself with respect to an order authorizing the use of a mobile tracking device on a rose-colored Porsche Cayenne, with MN license BZMXXX issued on February 15, 2019 and extended on April 17, 2019;

4.    All evidence seized, including observations by the arresting officer, as a result of a warrantless seizure and search of Mr. Green and the vehicle he was driving on April 19, 2019;

5.    All evidence seized as a result of a search of four cell phones pursuant to a search warrant issued on July 9, 2019;

6.    All evidence seized as a result of the warrantless search and seizure on July 8, 2019 of a 2012 Audi Q7, a rose 2004 Porsche Cayenne, a black BMW (IL plate AGXXXXX), and a black Bentley sedan, and the subsequent search, pursuant to a search warrant issued on July 9, 2019, of those same vehicles; and

7.    All evidence produced as a result of tracking warrants issued on June 13, 2019 for a 2012 Audi Q7 and a 2018 black Maserati Ghilibi; June 26, 2019 for a 2019 Silver Chevrolet Equinox; and on April 18, 2019 for a 2019 red Chevrolet Camaro.[1]

(Dkt. 258.) In addition, Green sought a hearing under *Franks v. Delaware*, 438 U.S. 154

(1978). (*Id.*)

On September 23, 2020, this Court issued an Order denying the request for a

*Franks* hearing in part and granting it in part as follows:

---

[1]    Green stated in his memorandum of law that based on the Government's representation that the warrants in paragraph 7 were not executed, he no longer seeks suppression of these warrants. (Dkt. 350 at 4 n.1.) Based on that statement, the Court understands the Motion to Suppress is withdrawn as to the warrants raised in paragraph 7, and does not address those warrants in this Report and Recommendation.

In particular, the March 6, 2019 Search Warrant Application provides in relevant part as follows:

> Your Affiant learned of a narcotics dealer who uses the street name of "Stunna". The information was obtained via a SCALES interview during the course of a narcotics arrest. "Stunna" was said to be a large scale supplier of Heroin. During the course of the interview the arrested party stated they had been in a Porsche SUV with "Stunna" and purchased 100 grams of heroin. "Stunna" was said to often drive a Porsche SUV that was Rose in color. **The phone number of <u>612-263-12[XX]</u> was identified as the mobile number used to contact "Stunna" and arrange for the mobile sale of narcotics**.

(Gov't Ex. 9 at 3 (emphasis added).) The May 1, 2020 request for an extension contains similar language with respect to the *Scales* interview. (*See* Gov't Ex. 10 at 3.)

The June 11, 2019 Search Warrant Application, on the other hand, provides in relevant part as follows:

> Your Affiant learned of a narcotics dealer who uses the street name of "Stunna". The information was obtained via a SCALES interview during the course of a narcotics arrest. "Stunna" was said to be a large scale supplier of Heroin. During the course of the interview the arrested party stated they had been in a Porsche SUV with "Stunna" and purchased 100 grams of heroin. "Stunna" was said to often drive a Porsche SUV that was Rose in color. **The phone number of <u>612-219-98[XX]</u> was identified as the mobile number used to contact "Stunna" and arrange for the mobile sale of narcotics.**

(Gov't Ex. 11 at 2-3 (emphasis added).)

Green asserts that, given that the portions of the warrant affidavits at issue contain identical language except for the two entirely different telephone numbers identified as the number used by "Stunna" to arrange the sale, he has made the requisite showing of an intentionally false or reckless statement to justify a *Franks* hearing. (Dkt. 259 at 4-5.)

The Court concludes that Green has met his burden to show that the difference in telephone numbers allegedly provided by the *Scales* interviewee was at least a false statement made with reckless disregard for

the truth, warranting a *Franks* hearing. . . . Here, the two warrants at issue pertain to the same investigation and are identical with respect to the information regarding the *Scales* interview except for the telephone number attributed to "Stunna" in arranging for the mobile drug buy.

The Government concedes that one of these telephone numbers is false by asserting that the "263" number is correct. (Dkt. 271 at 4.) According to the Government, what Green characterizes as deliberate falsehoods are more rationally explained as mistakes made by Officer Schmitt in copying and pasting the same language between warrant affidavits and then hastily going back and making changes in an attempt to tailor the June 11, 2019 Tracking Warrant to track the 219 number, and in each instance where the 263 number should appear, the 219 number appears instead. (Dkt. 271 at 4.) Indeed, "[a]llegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008) (citations omitted). By way of example, the Court has previously concluded with respect to the July 8, 2019 Search Warrant for a Burnsville residence (Gov't Ex. 7) that a one digit difference within the 612-265-12XX number versus 612-263-12XX in the same search warrant application at most amounted to a typographical error and was insufficient to demonstrate a reckless or deliberate falsehood. (Dkt. 212 at 10.) Here, however, it is insufficient to say that the wholesale changing of a telephone number provided by the *Scales* interviewee, where the interview was presumably taped pursuant to state law and could be reviewed by Officer Schmitt, is a typographical error. While the evidence may ultimately show that this was merely a mistake on the part of Officer Schmitt, the record before the Court indicates that Officer Schmitt used the same facts obtained from the same *Scales* interview relating to the same drug sale to obtain two different tracking warrants for two different numbers, which is troubling and sufficient to require a *Franks* hearing. Green should be able to at least question Officer Schmitt about why he used two numbers from the same source for different warrants and the process that went into drafting this portion of the affidavits for both the March 6, 2019 Tracking Warrant (as extended on May 1, 2019) and June 11, 2019 Tracking Warrant.

(Dkt. 296 at 4-7 (emphasis in original).)

The Court next examined whether the warrants for the 612-263-12XX number were supported by probable cause if the allegedly offending information from the *Scales* interviewee was excluded from the search warrants:

4

1.    **March 6, 2019 Tracking Warrant for 612-263-12XX**

With respect to March 2019 tracking search warrant for 612-263-12XX, outside of the information from the *Scales* interviewee, the supporting affidavit contained the following information:

- Your affiant was able to investigate this information and determined that "Stunna" was named Kevin Termell Green. It was further learned that his girlfriend used the social media name of Minnie Betty Jean.

- Green has a controlled substance felony conviction out of Illinois.

- Surveillance was established in the area of Franklin Ave and Nicollet Ave searching for a target of a separate narcotics investigation. Officer Schmitt noted a Rose-colored Porsche SUV drive down the alley and into the back parking lot of XXXX Blaisdell Ave South. The vehicle's license plate was noted as BZMXXX. It registered to a Minnie Loyd. A comparison of photographs confirmed that Minnie Loyd was the same individual as Minnie Betty Jean.

- Officer Schmitt was able to physically observe and identify Green driving this vehicle. Green was observed travelling to multiple locations and meeting with three different persons for short periods of time. The locations included XXXX Blaisdell Ave S where GREEN pulled into the back parking lot and met with a male. Green then drove to Winnetka and Highway 55 in Golden Valley where he left his vehicle running in the traffic lane of the parking lot in front of a restaurant while he met with a male in a vehicle. Green then drove to Mickey's Liquor on Plymouth Ave N and Emerson Ave N where he met with another person in a vehicle. Officer Schmitt believed that these interactions in his experience were indicative of narcotics transactions.

- It was believed that Green may be living at an address in Burnsville, however, this information had not been confirmed.

- The phone number 612-263-12XX has been identified as a Verizon Wireless affiliated and operated number.

(Gov't Ex. 9 at 3.)

The only portion of Officer Schmitt's affidavit that linked the 612-263-12XX number to any criminal activity was the information from the *Scales* interviewee regarding the number being used to contact "Stunna" and arrange for the mobile sale of narcotics. There was no other information connecting the phone number to any individual under criminal investigation. Without the information from the *Scales* interviewee, there is no support for the issuance of the March 6, 2020 Tracking Warrant for that phone number, and therefore a *Franks* hearing should be held to determine the correct number provided by the *Scales* interviewee.

## 2.    May 1, 2019 Extension of Tracking Warrant for 612-263-12XX

The May 1, 2019 extension of the March 6, 2019 Tracking Warrant for 612-263-12XX contains the same supporting facts as the March 2019 supporting affidavit, with the following additional relevant information:

- It was believed that Green may be living at the address of XXXX in Burnsville. The residence was rented by Loyd.

- The phone number 612-263-12XX had been identified as a Verizon Wireless affiliated and operated number. A current court order was in place on this cell phone but was expiring.

- A CRI stated that Green used the Porsche to distribute heroin in Minneapolis and employs people to sell narcotics for him. Green had been identified as running surveillance from the Porsche SUV while supervising the sale of heroin on the streets. At one point a CRI identified a male known as "Black" driving a Dodge van with MN license plate BREXX waiting at a location in the City of Minneapolis. The CRI stated heroin users were lined up and waiting for Black to sell them heroin. The CRI said the Porsche pulled up, tossed a bag to "Black" in the driver's seat of the van and a feeding frenzy of heroin transactions occurred. The CRI stated that it was a pound of heroin. The van BREXX registered to Loyd. "Black" had yet to be identified.

- On April 17, 2019, surveillance was conducted on Green. Officer Schmitt observed Green exit a home in Burnsville. This was the first time he had visually been observed at the address he is believed to live at. Green got into the passenger seat of a Red Chevrolet Camaro with Kentucky license plate 085XXX. The vehicle's license plate was run and found to be a rental vehicle. Green had previously been observed driving a rental vehicle about a month earlier. That vehicle had been rented and returned to the Midway airport in Chicago on April 6. That

vehicle, an Infinity with an Ohio license plate of GEDXXXX, had been rented by Kyamiaya Howell in the Chicago area. Howell may be Green's sister.

- Green had recently driven to Chicago where he stayed for about 20 hours before returning to the Twin Cities. On April 6, 2019, Green's phone location logged time in at the Midway airport location in Chicago. The affiant later confirmed that the Camaro was rented on that date. When Green reached the area around Black River Falls, Wisconsin, his phone was turned off. In Officer Schmitt's experience, turning off a cell phone during a partial or full trip from Chicago to the Twin Cities when transporting drugs is not uncommon.

- Green was observed driving from Burnsville to multiple locations. Of note, he drove to 45 Street East and Clinton Ave S in Minneapolis where he exited his vehicle and took a seat in the rear of a Chrysler 300. Green exited the Chrysler within 5 minutes and was holding something that appeared to have weight to it under his jacket. His actions were that of concealing as he hunched over and scanned the area with his head moving side to side as he got back into his vehicle. Green now took over as the driver of the Camaro. Officer Schmitt was able to later identify Minnie Loyd as the passenger in the vehicle.

- On April 24, 2019, Green was again in Chicago and had been for about two days. Around 2130 hours, Green was headed back towards Minneapolis and his phone was turned off around Janesville, Wisconsin. That phone at that time had yet to be turned back on.

(Gov't Ex. 10.)

Similar to the March 6, 2019 Tracking Warrant, the May 1, 2019 extension is dependent on the information from the *Scales* interviewee that the 612-263-12XX number was used to arrange for the drug transaction. The remainder of the affidavit does not connect the cell phone to illegal activity or to any other person. While the May 1, 2019 affidavit does mention the fact that a phone belonging to Green was turned off in a manner that [is] typically done by drug traffickers to avoid detection by law enforcement, there is no indication that the phone mentioned belonging to Green was the 612-263-12XX number, and in any event such information could be excluded as possible fruit of a poisonous tree depending on what occurs with the March 6, 2019 Tracking Warrant. Therefore, like the March 6, 2019 Tracking Warrant, the Court finds that a *Franks* hearing is appropriate with respect to inquiring about the correct number provided by the *Scales* interviewee in

connection with the May 1, 2019 extension.

(*Id.* at 9-13.)

On May 6, 2021, the Court held a hearing on the Motion to Suppress during which Officer Maxwell Bullock testified regarding the April 18, 2019 traffic stop and search he conducted related to Green.  (Dkt. 334.)  In addition, Officer Jason Schmitt, the officer who drafted the affidavits for the search warrants and is the subject of the *Franks* hearing at issue testified at the May 6, 2021 hearing.  (*Id.*)  The hearing was continued to June 8, 2021, during which Officer Jeffrey Werner and Sergeant Lucas Peterson also testified. (Dkt. 344.)  Briefing relating to the pending motions was completed on July 27, 2021.

## II.    ANALYSIS—MOTION TO SUPPRESS

### A.    The Tracking Warrants for the Porsche Cayenne

On February 15, 2019, Officer Schmitt applied for and obtained a tracking warrant for a 2004 rose-colored Porsche Cayenne SUV, which was then extended on April 17, 2019.  (*See* Gov't Ex. 7 (hereinafter "February 15 Warrant").)  Green concedes that the warrant was never executed.  (Dkt. 350 at 5.)  Indeed, Green does not seek to suppress any evidence obtained via the February 15 Warrant itself.  (*Id.*)  Instead, it is Green's position that the existence of the February 15 Warrant should be suppressed and therefore any mention of it in support of the issuance of later search warrants should be suppressed, including in support of the issuance of the March 6, 2019 tracking warrant for telephone number 612-263-12XX, as extended on May 1, 2019 (Gov't Exs. 4-5 (hereinafter "March 6 Warrant")).  (*See* Dkt. 350 at 10-11.)

According to Green, the defect in the February 15 Warrant is that there is no

indication whatsoever as to when the information in the supporting affidavit occurred. (*Id.* at 6.) The Government counters that this warrant was not executed, and no evidence was gathered as a result of this warrant. (Dkt. 351 at 2.) Therefore, in the Government's view, there is no need to review its four corners for probable cause. (*Id.*)

The supporting application for the February 15, 2019 Warrant provided as follows:

Your affiant, Officer Jason Schmitt, has been a Minneapolis Police Officer for twenty years. Affiant is currently assigned as an investigator with the Minneapolis Police Weapons Unit. While working in this capacity, affiant has made multiple arrests and has been involved in weapons/narcotics investigations that have led to felony convictions. As a weapons investigator, affiant investigates crimes involving firearms, such as crimes of violence involving a firearms and narcotics sale and possession involving firearms.

Your Affiant learned of a narcotics dealer who uses the street name of "Stunna". The information was obtained via a SCALES interview during the course of a narcotics arrest. "Stunna" was said to be a large scale supplier of Heroin. During the course of the interview the arrested party stated they had been in a Porsche SUV with "Stunna" and purchased 100 grams of heroin. "Stunna" was said to often drive a Prosche [sic] SUV that was Rose in color.

Your affiant was able to investigate this information and determined that "Stunna" was named Kevin Termell GREEN, DOB [ ]. It was further learned that his girlfriend used the social media name of Minnie Betty Jean.

GREEN has a Controlled Substance Felony Conviction out of Illinois.

Surveillance was established in the area of Franklin Ave and Nicollet Ave searching for a target of a separate narcotics investigation. Your affiant noted a Rose-colored Porsche SUV drive down the alley and into the back parking lot of XXXX Blaisdell Ave South. The vehicles license plate was noted as BZMXXX. It registered to a Minnie Loyd. A comparison of photographs confirmed that Minnie Loyd was the same individual a Minnie Betty Jean.

Affiant was able to physically observe and identify Kevin Termell GREEN, DOB [ ] driving this vehicle. GREEN was observed travelling to multiple locations and meeting with three different persons for short periods of time. The locations included XXXX Blaisdell Ave S where GREEN pulled into the back parking lot and met with a male. GREEN then drove to Winnetka

and Highway 55 in Golden Valley where he left his vehicle running in the traffic lane of the parking lot in front of Pancheros restaurant while he met with a male in a vehicle. Green then drove to Mickey's Liquor on Plymouth Ave N and Emerson Ave N where he met with another person in a vehicle. These interaction in your affiant's experience are indicative of narcotics transactions.

(Gov't Ex. 7.)

To the extent that Green is seeking to suppress evidence obtained via the February 15 Warrant, the Motion to Suppress should be denied as moot, given there is no such evidence. Green also appears to seek the suppression of the existence of the February 15 Warrant based on timeliness of the information supporting probable cause.

"[A] warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence." *United States v. Humphrey*, 140 F.3d 762, 764 (8th Cir. 1998). "While a lapse of time between the observations of a witness and the issuance of a search warrant may render probable cause fatally stale, there is no bright-line test for determining when information is stale." *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007) (cleaned up). "A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." *United States v. C-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) (cleaned up). "The date of the occurrence of the facts relied upon in an affidavit is of importance in the determination of probable cause because untimely information may be deemed stale." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) (citing *Gettel*, 474 F.3d at 1086; *United States v. LaMorie*, 100 F.3d

547, 554 (8th Cir. 1996)).  "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered."  *Gettel*, 474 F.3d at 1086 (cleaned up).  Indeed, "in investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale."  *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (cleaned up).

It is unclear from the face of the February 15 Warrant when any of the alleged events occurred, making it impossible to determine whether the information supporting probable cause was timely or stale.  While the Government argues that the *Leon* good-faith exception applies (Dkt. 351 at 2 n.2), the *Leon* exception applies if the executing officer's reliance upon the warrant was objectively reasonable.  *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).  Here, there was no executing officer, and therefore the *Leon* exception cannot apply.  On this basis, the Court recommends suppression of the February 15 Warrant and supporting application as evidence at trial.

**B.    The Tracking Warrants for the 612-263-12XX Cell Phone**

Green seeks to suppress all location data with respect to telephone number 612-263-12XX, the tracking of which was authorized by the March 6 Warrant.  According to Green, the March 6 Warrant suffers from the same defects as the February 15 Warrant, as the supporting application provides no basis for the issuing judge to conclude that the information supporting probable cause was timely.  (Dkt. 350 at 11.)

The relevant portions of the probable cause for the search warrant set forth in

Officer Schmitt's March 6, 2019 Affidavit ("March 6 Affidavit") provide as follows:

> Your Affiant learned of a narcotics dealer who uses the street name of "Stunna". The information was obtained via a SCALES interview during the course of a narcotics arrest. "Stunna" was said to be a large scale supplier of Heroin. During the course of the interview the arrested party stated they had been in a Porsche SUV with "Stunna" and purchased 100 grams of heroin. "Stunna" was said to often drive a Porsche SUV that was Rose in color. The phone number of 612-263-XXXX was identified as the mobile number used to contact "Stunna" and arrange for the mobile sale of narcotics.

> Your affiant was able to investigate this information and determined that "Stunna" was named Kevin Termell GREEN, DOB XX/XX/XXXX. It was further learned that his girlfriend used the social media name of Minnie Betty Jean.

> GREEN has a Controlled Substance Felony Conviction out of Illinois.

> Surveillance was established in the area of Franklin Ave and Nicollet Ave searching for a target of a separate narcotics investigation. Your affiant noted a Rose-colored Porsche SUV drive down the alley and into the back parking lot of XXXX Blaisdell Ave South. The vehicle's license plate was noted as BZMXXX. It registered to a Minnie Loyd. A comparison of photographs confirmed that Minnie Loyd was the same individual a [sic] Minnie Betty Jean. Affiant was able to physically observe and identify Kevin Termell GREEN, DOB XX/XX/XXXX driving this vehicle. GREEN was observed travelling to multiple locations and meeting with three different persons for short periods of time. The locations included XXXX Blaisdell Ave S where GREEN pulled into the back parking lot and met with a male. GREEN then drove to Winnetka and Highway 55 in Golden Valley where he left his vehicle running in the traffic lane of the parking lot in front of Pancheros restaurant while he met with a male in a vehicle. Green then drove to Mickey's Liquor on Plymouth Ave N and Emerson Ave N where he met with another person in a vehicle. These interaction [sic] in your affiant's experience are indicative of narcotics transactions.

> It is believed that GREEN may be living at the address of XXXX in Burnsville, however this information is yet to be confirmed.

> The phone number 612-263-XXXX has been identified as a VERIZON WIRELESS affiliated and operated number.

> Affiant is requesting the court's permission to establish the listed technology

on the phone number of 612-263-XXXX to further the investigation into the sale of narcotics by Kevin Termell GREEN, DOB XX/XX/XXXX. The GPS tracking of GREEN's cell phone will allow officers to establish physical surveillance in order to confirm the residence of GREEN. In learning this, affiant hopes to learn the location and storage area for the narcotics along with any co-conspirators involved in distribution.

Affiant will also track movements of GREEN and attempt to witness narcotics transactions as they occur.

This order will also aid in the location of GREEN to facilitate the installation of a GPS tracker for his vehicle. Affiant currently has a tracking order signed by a judge for the Porsche SUV operated by GREEN.

(Gov't Ex. 4.)

With respect to Green's previous timeliness arguments this Court concluded its

Report and Recommendation as follows:

The Court acknowledges that the March 2019 Affidavit lacks any mention of specific dates as to any of the events. "While a lapse of time between the observations of a witness and the issuance of a search warrant may render probable cause fatally stale, there is no bright-line test for determining when information is stale." *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007) (cleaned up). "A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." *United States v. C-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) (cleaned up). "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered." *Gettel*, 474 F.3d at 1086 (cleaned up). Indeed, "in investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale." *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (cleaned up).

While lack of a date for the *Scales* interview is problematic, it does not necessarily render a search warrant *per se* invalid given that courts are charged with "making a common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*,

462 U.S. at 238. The March 2019 Affidavit contains information that the number at issue was an operated number at the time and also provided: "[t]his order will also aid in the location of GREEN to facilitate the installation of a GPS tracker for his vehicle. **Affiant currently has a tracking order signed by a judge for the Porsche SUV operated by GREEN**." (Dkt. 158-1 at 2 through 5 of 67 (emphasis added).) Any lapse of time between the *Scales* interview and the active tracking warrant for the Porsche involved in the alleged drug dealing "is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." *Ortiz-Cervantes*, 868 F.3d at 700 (quoting *United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010), quoting *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999)). Indeed, "[a] cell phone is a durable, legal object likely to be found with its owner, unlike a drug stash or a murder weapon of which one would quickly dispose." *United States v. Grupee*, No. CRIM.A 08-10339-WGY, 2009 WL 4938669, at *2 (D. Mass. Dec. 15, 2009), *aff'd*, 682 F.3d 143 (1st Cir. 2012). The fact that Officer Schmitt had an active tracking affidavit for the Porsche SUV driven by Green related to his drug trafficking at the time Officer Schmitt sought the March 2019 Search Warrant for the number also provided by the *Scales* interviewee, coupled with the durable nature of phones (as opposed to a drug stash), and that the phone number was operating, leads this Court to find that there was a fair probability that contraband or evidence of a crime would be found by tracking the cell phone. As such, the motion to suppress should be denied on this basis.

(Dkt. 212 at 35-36 (emphasis in original).)[2]

Green asserts that this Court did not have the February 15 Warrant for the Porsche SUV, *supra*, before it at the time it issued its April 27, 2020 Report and Recommendation. (Dkt. 350 at 12.) According to Green, the March 6 Affidavit should have any reference related to February 15 Warrant for the Porsche SUV stricken, as a fruit of a poisonous tree, thereby making the suppression of the March 6 Warrant also appropriate as it too is supported by stale evidence. (*Id.*)

---

[2]    The Court notes that Green has objected to this Court's Report and Recommendation. (Dkt. 255.)

Even assuming that a suppressed search warrant on its own, without any resulting evidence, can taint a subsequent search warrant, the Court would still not recommend suppression of the March 6 Warrant. The Court found in its previous Report and Recommendation that the March 6 Warrant should not be suppressed on the alternative basis that the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), applied. The Government again asserts the *Leon* exception (Dkt. 351 at 5), and the Court finds no basis to change this recommendation. Indeed, the additional information provided since the April 27, 2020 Report and Recommendation further supports the finding that even if the warrants were deficient, the officers' reliance on the warrants would have been reasonable under *Leon*.

Under *Leon*, "'evidence seized pursuant to a search warrant issued by a [judge] that is later determined to be invalid[] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable.'" *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *Proell*, 485 F.3d at 430). In *Leon*, the Supreme Court stated that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" 468 U.S. at 922 (citations omitted). However, there are certain instances when "the purpose of the exclusionary rule—deterring police misconduct—will not be served by suppressing illegally seized evidence." *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *Leon*, 468 U.S. at 922-23. "When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational

reason for suppressing the fruits of the search." *Martin*, 833 F.2d at 755. The Court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 923 n.23. The reviewing court should consider the totality of the circumstances, "including any information known to the officer but not included in the affidavit . . . ." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted).

In the Court's April 27, 2020 Report and Recommendation, this Court noted that in his July 2019 Affidavit for the Search Warrant at XXXX, McAndrews Road, Burnsville, Minnesota ("Burnsville Residence"), Officer Schmitt stated that the *Scales* interview took place on January 31, 2019, just a little over a month before the March 2019 Search Warrant. (Dkt. 212 (citing Gov't Ex. 7 (December 4, 2019 Hearing)).)[3] *See Jackson*, 784 F.3d at 1231 (citation omitted) (finding that courts need to consider the totality of the circumstances, "including any information known to the officer but not presented to the issuing judge"). This was corroborated by Officer Schmitt at the May 6, 2021 hearing, who testified that he first became aware on January 31, 2019, through a *Scales* interviewee, of a large-scale heroin dealer named "Stunna." (Dkt. 338 at 56-57, 66-67.) This was the first time he had been made aware of "Stunna," and thus the investigation of this individual began. (*Id.* at 56-57, 66-67, 112.) As pointed out in Green's Reply, Officer Schmitt testified on cross-examination that the *Scales* interviewee

---

[3]     This is also marked as Government Exhibit 11.

had purchased 100 grams of heroin from "Stunna" from the rose-colored Porsche at an unspecified date. (*Id.* at 87.) According to Green, without knowing the date of the actual heroin transaction and when the 263 number was employed for a heroin deal, there is no way to determine if the arrestee's information was current. (Dkt. 352 at 10 n.1.)

Given the passage of a mere month as part of a narcotics investigation from when Officer Schmitt obtained the information from the *Scales* interviewee to when he sought the March 2019 Warrant, the fact Officer Schmitt first learned during the January 2019 *Scales* interview that "Stunna" was said to be a large scale supplier of heroin using a Rose-colored Porsche and using the 612-263-XXXX number, the fact that the 612-263-XXXX number was currently active, the durable nature of cell phones,[4] and the surveillance of Green in the rose-colored Porsche (as described by the CRI), during which Green appeared to engage in multiple transactions in what Officer's Schmitt's experience were indicative of a narcotics transaction sometime between the January *Scales* interview and the March application for the search warrant, the officers' reliance on the March 6 Warrant to track the cell phone was objectively reasonable, including as to the timing of the information, for the purposes of *Leon*.

For all of the reasons set forth above, the Court finds the motion to suppress the March 6 Warrant for tracking the 612-263-12XX number should be denied.

---

[4]     *United States v. Grupee*, No. CRIM.A 08-10339-WGY, 2009 WL 4938669, at *2 (D. Mass. Dec. 15, 2009), *aff'd*, 682 F.3d 143 (1st Cir. 2012) ("A cell phone is a durable, legal object likely to be found with its owner, unlike a drug stash or a murder weapon of which one would quickly dispose.").

**C.    The Tracking Warrant for the 612-219-98XX Cell Phone**

As part the continued motion to suppress the June 11, 2019 Tracking Warrant for 612-219-98XX (Gov't Ex. 6 (hereinafter "June 2019 Warrant")), Green relies on Officer's Schmitt's testimony at the *Franks* hearing that the correct number provided by the *Scales* interviewee associated with Stunna, "a large scale supplier of Heroin," was the 612-263-12XX cell phone number, and not the 612-219-98XX cell phone number set forth in the supporting affidavit for the June 2019 Warrant ("June 2019 Affidavit"). (Dkt. 350 at 16.) Indeed, Officer Schmitt testified at the May 2021 hearing that he used the March 6 Affidavit that he had drafted for the earlier tracking warrant for 612-263-12XX as a template for June 2019 Affidavit, and erred a number of times in his replacement of the 612-263-12XX cell phone number with the 612-219-98XX number. (Dkt. 338 at 70-73.) As Green points out, the June 2019 Affidavit also incorrectly states that the 612-219-98XX number was used to rent a Maserati and that a current court order was in place on this cell phone, which was expiring. (Dkt. 350 at 16 (citing Gov't Ex. 6 at 3-4).) As noted by the Court in its *Franks* Order:

> The Government does not assert that these statements in the affidavit are true. The Government in fact concedes that Loyd did not use the 219 number to rent the Maserati, but insists she used the number to rent other cars. (Dkt. 168 at 21; Dkt. 168-4.) The Court concludes that Green has met his burden for the purpose of obtaining a Franks hearing that these representations were either intentional or reckless falsehoods.

(Dkt. 296 at 7.)

The determination for this Court, assuming that the statements are false or reckless, is whether there is sufficient probable cause in the supporting affidavit for a

warrant's issuance once the offending portions are removed. *See United States v. Reinholz*, 245 F.3d 765, 775 (8th Cir. 2001) ("We remedy a *Franks* misrepresentation by deleting the false statements. The entire fifth paragraph of Officer Podany's affidavit contains false information and the district court was correct to delete it. Thus, the district court did not err when it deleted the fifth paragraph of Officer Podany's affidavit.").

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 238). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. With respect to the cell site location information obtained from GPS phone tracking, there must be a fair probability that evidence of suspected narcotics dealing would be found in data generated by the tracking of the cellular phone at issue. *See United States v. Stachowiak*, No. 18-CR-296-SRN-KMM, 2019 WL 3292048, at *7 (D. Minn. Apr. 23, 2019), *R.&R. adopted*, 2019 WL 2560519 (D. Minn. June 21, 2019); *see generally United States v. Carpenter*, 138 S. Ct. 2206, 2217-20 (2018). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of

everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231). In reviewing the decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed. *See Gates*, 462 U.S. at 238-39 (citation omitted); *see also LaMorie*, 100 F.3d at 552 (citation omitted) ("Our duty as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)); *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)).

In this case, the Court has previously found in the context of the *Franks* hearing that sufficient probable cause would still exist for the issuance of the June 2019 Warrant even if the offending portions were omitted from the June 2019 Affidavit:

> Even assuming that the Court were to remove the information from the *Scales* interview regarding the number used in the drug transaction, the information regarding the current court order that was expiring, and the information that Loyd rented a Maserati using the 612-219-98XX number, the Court finds that sufficient probable cause still exists for the issuance of

20

the June 11, 2019 Tracking Warrant. The affidavit also provided the following relevant facts: the *Scales* interviewee provided that a "Stunna" used a Porsche SUV to distribute heroin (Gov't Ex. 11 at 2); it was determined that Green was "Stunna" and that Loyd was his girlfriend (*id.* at 3); a Porsche SUV was registered to Loyd (*id.*); a CRI provided that the driver of the Porsche had been running a heroin distribution ring using a Porsche in which a person in the Porsche would give another person in a Dodge van with Minnesota license plate BREXXX heroin, who would then sell the heroin (*id.*); that the aforementioned Dodge van with Minnesota license plate BREXX was registered to Loyd; that the 612-219-98XX number belonged to Loyd (*id.* at 4); and that it was believed that Loyd was a co-conspirator with Green in the distribution of narcotics and that Green was rarely seen without Loyd (*id.* at 4-5). Given that Loyd was connected to two instrumentalities of narcotics distribution (two of the vehicles involved in heroin distribution) used by Green as corroborated by information from CRIs, that the 219 number belonged to Loyd, and that it appears that that Green was rarely observed without Loyd as a possible co-conspirator, the Court finds based on the totality of this information that there was a fair probability that evidence of suspected narcotics dealing would be found in data generated by the tracking of the cellular phone at issue. As such, the Motion for a *Franks* hearing with respect to the search warrant for the 612-219-98XX number is denied.

(Dkt. 296 at 14.) In his appeal of this Court's *Franks* Order, which Judge Davis denied (Dkt. 316), Green argued what he now argues to this Court—that it simply accepted as a fact that the 612-219-98XX number belonged to Loyd, but it did not consider on what basis an issuing judge could accept this conclusion as true with no supporting evidence. (*Compare* Dkt. 350 at 20-22, *with* Dkt. 305 at 12.)

In any event, the Court considers whether the remaining statements in the June 2019 Affidavit establish probable cause connecting Loyd to the 612-219-98XX number, keeping in mind that "[a] court must review the sufficiency of a search-warrant affidavit using a 'common sense' and not a 'hypertechnical' approach." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007). Here, the affiant stated that the phone number 612-

21

219-98XX had been identified as a Verizon Wireless affiliated and operated number and stated that the number belonged to Loyd. (Gov't Ex. 6.) While it is a close call, given that the affiant's statement that the 612-219-98XX had been identified as a Verizon affiliated and operated number indicates some type of investigation into the number, a common sense reading of the application supports that Officer Schmitt determined that the 612-219-98XX belonged to Loyd in the course of determining that the number was a Verizon affiliated and operated number. For these reasons, the Motion to Suppress related to the June 2019 Warrant, which is the tracking warrant for the 612-219-98XX number, should be denied.

D.    **The April 18, 2019 Seizure and Search of Green and his Vehicle**

Green challenges the April 18, 2019 traffic stop and subsequent searches of himself and his vehicle on the grounds that there was no valid basis to conduct a traffic stop and on the basis that the claimed inventory search was merely a pretext to search for contraband. (Dkt. 350 at 24-28.)

1.    **Factual Background**

During the May 20, 2021 hearing, Minneapolis Police Officer Maxwell Bullock testified regarding the April 18, 2019 stop of Green. Officer Bullock testified that he was patrolling with his field-training officer, Justin Reisdorfer, around midnight on April 18, 2019, in the squad car he was driving near the cross streets of Lake and Blaisdell in Minneapolis. (Dkt. 338 at 14-15.) Officer Bullock testified that they were parked in an alleyway of a street south of Lake Street West and west of Blaisdell, facing northbound at approximately 11:38 p.m. (*Id.* at 15-16.) Officer Bullock testified that while he did not

remember why he was parked in the alleyway, he asserted that it had a good vantage point of Lake Street without any vehicle seeing the police, and had a great vantage point for watching vehicles exiting a nearby White Castle parking lot. (*Id.* at 28.)

Officer Bullock testified that while parked in this alleyway, he observed a red Camaro pulling out of the White Castle parking lot by taking a right-hand turn heading westbound on Lake Street, and he observed that as the vehicle made the right-hand turn, it crossed straight over two lanes of traffic going immediately into the left lane and then continued westbound on Lake Street. (*Id.* at 17-19, 46.) Officer Bullock noted that there were two lanes of traffic going westbound on Lake Street. (*Id.* at 18; Gov't Exs. 1-3.) There were also two lanes of traffic going eastbound on Lake Street. (Dkt. 338 at 18.) Officer Bullock could not recall if the red Camaro signaled its right-hand turn out of the parking lot. (*Id.* at 19.) According to Officer Bullock, when a driver takes a right-hand turn from the White Castle parking lot onto Lake Street, the driver must take the closest travel way—which is the right lane nearest to the curb—and if the driver wants to move to the left lane, the driver needs to signal his intent to move to the left lane after making the initial turn from the parking lot. (*Id.* at 19.) Officer Bullock asserted that the Camaro, rather than turning into the right lane nearest the curb and signaling its intent to move into the left lane, immediately crossed over to the left lane after turning out of the parking lot. (*Id.*) Officer Bullock testified that based on his training and experience, he knew that doing so was an illegal lane change in violation of Minn. Stat. § 169.19, subdivision 1(a). (*Id.* at 30.)

Officer Bullock also testified that after observing what he considered to be a

traffic violation, he stopped the Camaro at the intersection of Lake Street West and Grand Avenue South.  (*Id.* at 20, 31.)  Officer Bullock testified that he did not recall anyone asking him to stop the Camaro.  (*Id.* at 28-29, 41.)

Officer Bullock obtained a Minnesota ID from the driver (which was not a driver's license) which identified the driver as Kenneth Green, and the driver affirmed that his name was Kenneth.  (*Id.* at 21.)  When Officer Bullock ran the driver's name through the system, he discovered that Green's driver's license had been revoked, which is another traffic violation.  (*Id.* at 22.)  After determining that Green's license had been revoked, Officer Bullock decided to cite him for driving after revocation.  (*Id.* at 22-23.)  Officer Bullock testified that he had probable cause to believe that Green also committed the misdemeanor traffic offense of driving after revocation.  (*Id.* at 44.)

As Officer Bullock walked back towards Green, he initially asked Green to put one cell phone down so he could have him step out of the vehicle.  (*Id.* at 23.)  While Green put that phone down, he proceeded to grab another phone.  (*Id.*)  Officer Bullock asked him to put the second phone down as well.  (*Id.*)  Officer Bullock testified that at some point Officer Reisdorfer told him that Green had possibly dropped a "baggie" of some sort.  (*Id.*; *see also* Def. Ex. 5 at 05:16-24.)  While Officer Bullock did not see the baggie,[5] this raised concerns regarding safety, so he had Green step out and placed him in handcuffs.  (Dkt. 338 at 23.)  Officer Bullock took Green to the front of the squad car and frisked him for weapons for officer safety prior to placing him in the squad car.  (*Id.* at

---

[5]    No "baggie" was ultimately recovered.  (Dkt. 338 at 35-36, 42.)

19, 38.)  He also testified that when he placed someone in the back seat of his squad car to process a driving-after-revocation citation, he always performed a frisk for officer safety.  (*Id.* at 45.)  As part of this search, Officer Bullock felt what could have been a weapon in Green's pocket, which turned out to be a phone, as well as roughly $3,500 in cash.  (*Id.* at 23-24, 39.)  Officer Bullock secured Green in the vehicle as he processed the citation and then released Green once giving him the citation.  (*Id.* at 24-25.)  Green was asked if he wanted anything from the car, and he stated he wanted his food and his cell phones, along with his cash, which were provided to him by police.  (*See* Def. Ex. 5 at 32:40-36:26.)

Because Green did not have a license to drive and the vehicle was illegally parked, officers had the vehicle towed.  (Dkt. 338 at 34.)  The vehicle was illegally parked because it was too far from the curb.  (*Id.* at 33-34.)  Before the tow came, officers conducted a property inventory search of the vehicle.  (*Id.* at 24.)  According to Officer Bullock, the purpose of vehicle inventory search before a tow is to determine whether or not there are any personal belongings that the driver would need from the car, to make sure there were no weapons before it gets to the impound lot, and to document everything that was in the vehicle, thereby protecting the property of the owner of the vehicle and the officers against claims of property loss.  (*Id.* at 34-35.)  Officer Bullock could not recall what property was discovered during the inventory search.  (*Id.* at 36.) Photographs (from what appear to be stills from an officer body camera) of the vehicle showed a pair of Beats by Dr. Dre headphones in the back seat and other property in the trunk.  (*Id.* at 35-36; Def. Exs. 2-3.)  While a property inventory sheet was prepared for

25

the Camaro, there was no property listed on the sheet.  (Dkt. 338 at 36-37; Def. Ex. 4.)

On cross-examination, Officer Bullock acknowledged that officers looked under the hood

of the Camaro, but asserted that was to check for weapons, as well as other items.  (Dkt.

338 at 37-38.)

### 2.    Validity of Traffic Stop Under the Fourth Amendment

The Fourth Amendment guarantees the "right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

Const. amend. IV.  A traffic stop constitutes a seizure for Fourth Amendment purposes.

*Whren v. United States*, 517 U.S. 806, 809-10 (1996).  "To constitute a reasonable

seizure, a traffic stop must be supported by, at a minimum, 'a reasonable, articulable

suspicion that criminal activity' is occurring."  *United States v. Frasher*, 632 F.3d 450,

453 (8th Cir. 2011) (quoting *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001)).

"A traffic violation, however minor, provides probable cause sufficient to satisfy the

constitutional reasonableness requirement."  *Id.* (citing *United States v. Ehrmann*, 421

F.3d 774, 780 (8th Cir. 2005)).  "A traffic stop generally must be supported by at least a

reasonable, articulable suspicion that criminal activity has occurred or is occurring, and a

traffic violation—however minor—creates probable cause to stop the driver of a

vehicle.'"  *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (marks and citations

omitted).  As part of this analysis, "the determinative question is not whether a traffic

violation had actually occurred, but whether an objectively reasonable police officer

could have formed a reasonable suspicion that the driver was committing a code

violation."  *Id.* (cleaned up) (marks and citation omitted).  While Green asserts that

Officer Bullock's motivation for the stop was to search for contraband (Dkt. 350 at 28),

"an officer's subjective motivation—whether revealed at the time of the traffic stop or at

the time of a suppression hearing—is irrelevant to the probable-cause inquiry."  *United*

*States v. Demilia*, 771 F.3d 1051, 1055 (8th Cir. 2014).

   Green's major contention with respect to the stop is that Green's right turn from a

private White Castle parking lot immediately to the left lane of a two-lane travel way

could not have violated Minn. Stat. § 169.19, subd. 1(a), which Officer Bullock identified

as the basis for the stop.  (Dkt. 350 at 27-28.)  Section 169.19 provides as follows:

> Subdivision 1. Turning at intersection. The driver of a vehicle intending to
> turn at an intersection shall do so as follows:
>
> (a) Except as otherwise provided in this paragraph, both the approach for a
> right turn and a right turn shall be made as close as practicable to the right-
> hand curb or edge of the roadway.  When necessary to accommodate vehicle
> configuration, a driver is permitted to make a right turn into the farthest lane
> of a roadway with two or more lanes in the same direction in order to make
> a U-turn at a reduced conflict intersection, if it is safe to do so.

Minn. Stat. § 169.19, subd. 1(a).

   Green points to the decision in the Minnesota Court of Appeals in *Timmerman v.*

*Commission of Public Safety*, 2000 WL 1778316 *2 (Minn. Ct. App. Nov. 21, 2000), in

support of the proposition that Officer Bullock did not have probable cause to pull him

over for a traffic violation.  (Dkt. 350 at 27.)  In the unpublished decision, the Minnesota

Court of Appeals declined to extend the "change of course" signaling requirement in

Section 169.19 to vehicles exiting from a private parking lot onto a public road.  *See*

*Timmerman*, 2000 WL 1778316 at *2.  In a later unpublished decision, the Minnesota

Court of Appeals found probable cause for a traffic stop where the defendant committed

numerous traffic violations, including a violation of Section 169.19, subd. 5, when coming out of a private gas-station parking lot onto the public road.[6] *See State v. Urman*, No. A07-0031, 2008 WL 1971406, at *1-3 (Minn. Ct. App. May 6, 2008). At least one other court in this District has concluded that it is "far from clear" whether a failure to signal a turn when leaving a private parking lot constitutes a violation of Section 169.19. *United States v. Foster*, No. 10-CR-0049 (PJS/JJK), 2010 WL 1904891, at *3 (D. Minn. May 11, 2010), *order vacated in part on reconsideration on other grounds*, 752 F. Supp. 2d 1060 (D. Minn. 2010), *as amended* (Jan. 25, 2011)

In *Heien v. North Carolina*, 574 U.S. 54 (2014), the Supreme Court held that a reasonable "mistake of law can . . . give rise to the reasonable suspicion necessary to uphold [a] seizure under the Fourth Amendment." *Id.* at 58. The Court need not resolve the ultimate debate—whether turning right from a private parking lot into the left-most lane of a two-lane public travel way—is a violation of Minnesota law. The Court need only decide whether Officer Bullock reasonably thought it was. As part of this determination, an officer's subjective understanding of the law is irrelevant; the mistake of law must be objectively reasonable. *Id.* at 66 ("The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively reasonable*. We do not examine the subjective understanding of the particular officer

---

[6]    In his Reply, Green appears to take issue with *Urman* on the basis that the decision pertained to a failure to signal, as opposed to the instant alleged traffic offense. (Dkt. 352 at 6.) However, *Urman* is still instructive, as the question presented by this line of cases is whether various offenses under Section 169.19 apply to actions taken when a driver exits a private parking lot.

involved.") (emphasis in original); *see also United States v. Burnside*, 795 F. App'x 475, 476-77 (8th Cir. 2020). That said, "the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation. Thus, an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Heien,* 574 U.S. at 67. Relevant to this analysis is whether the law is ambiguous (reasonable minds could differ on the interpretation) and how it has been previously construed by the relevant courts. *Id.* at 67-68. Given the differing interpretations of Section 169.19 by the Minnesota Court of Appeals and the fact that at least one other court has noted that it is not clear whether Section 169.19 applies to vehicles exiting parking lots, any mistake in the law by Officer Bullock was objectively reasonable, rendering the stop of Green's vehicle valid for the purposes of the Fourth Amendment. Therefore, the Court recommends denial of the Motion to Suppress as it relates to the stop of the Camaro and the search of Green's person as the result of that stop.

### 3. Validity of Inventory Search Under the Fourth Amendment

Green also argues that the inventory search of the Camaro should be suppressed because it was an illegal pretext to conduct a search of the vehicle without a search warrant. (Dkt. 350 at 27-28.) In response, the Government represents as follows:

> Mr. Green discusses the legality of towing the vehicle. (DCD 350 at 27-28.) However, since no evidence was recovered from the inventory search or tow of the vehicle, the Court can consider this issue moot. The evidence that may be offered by the government at trial was already discovered prior to any inventory search of the vehicle, predominantly consisting of the fact that Mr. Green was driving the red Camaro rental vehicle, had a Minnesota

Identification card and used the false name of "Kenneth" Green, the fact he
had two cell phones in his possession, and he had $3,500 cash on his person.

(Dkt. 351 at 16.)  Green made no reply to this argument.

Based on the Government's representation that it is not relying on evidence from
the inventory search and tow of the Camaro, the Court recommends denial of the motion
to suppress the inventory search as moot.  *See United States v. Morris*, No. 17-CR-107
(DWF/TNL), 2018 WL 2193109, at *9 (D. Minn. May 14, 2018) ("Accordingly,
Defendant's motion is denied as moot given the Government's representations that it
does not intend to introduce evidence from the December 14, 2016 search and seizure in
its case-in-chief."); *United States v. Oliver*, No. CR 15-164 (DSD/BRT), 2015 WL
13731345, at *11 (D. Minn. Oct. 13, 2015) ("So far as the record shows, the only items
seized from Oliver's person were cash, a driver's license, and credit cards, none of which
the government intends to introduce in its case-in-chief at trial.  Oliver's request to
suppress evidence seized pursuant to his arrest is therefore moot, obviating any need for
this Court to consider the legality of his arrest.") (citation and footnote omitted), *R.&R.
adopted*, 2015 WL 7432334 (D. Minn. Nov. 23, 2015).

**E.    Three Cell Phones and Other Evidence Seized from Green's Vehicles on July
8, 2019**

Green asserts that on July 8, 2019, he was arrested in a vehicle, in conjunction
with the search of the Burnsville Residence, and that three cell phones were seized from
his vehicle in a warrantless search.  (Dkt. 350 at 29.)  On July 9, 2019, Officer Schmitt
applied for a search warrant for the phones.  (*See* Gov't Ex. 9 (hereinafter "July 9
Warrant").)  Green argues that the three cell phones seized from Green are subject to

suppression for two reasons: (1) Officer Schmitt's supporting affidavit does not support probable cause for the issuance of the July 9 Warrant; and (2) there was no basis for the warrantless seizure of the phones in the vehicle and the subsequent search as part of the July 9 Warrant was the fruit of the poisonous tree.  (Dkt. 350 at 29.)  (The warrant also authorized a search of a fourth cell phone identified as Loyd's (Gov't Ex. 9), and Green did not make any argument as to that phone.)

The Government counters that the Court should deny Green's motions regarding the cell phones because they were seized under the authority of *Riley v. California*, 573 U.S. 373, 388-91 (2014), under the automobile exception, under the inventory exception, on the basis that the subsequent search warrant was supported by probable cause, and based on the doctrine of inevitable discovery.  (Dkt. 351 at 16-17.)

### 1.    Factual Background

Minneapolis Police Officer Jeffrey Werner testified at the June 21, 2021 hearing that he assisted with the July 8, 2019 execution of the search warrant of Green's person and the Burnsville Residence.  (Dkt. 348 at 15.)  Officer Werner was conducting surveillance of Green at the Burnsville Residence, waiting for him to leave and then to follow him in order to take Green into custody.  (*Id.* at 16.)  Officer Werner was alerted to Green's departure from the Burnsville Residence in a vehicle and stopped Green at a strip mall parking lot approximately two miles from the Burnsville Residence.  (*Id.*)  Green was with his 18-year-old son at the time of the stop, as well as his younger son. (*Id.* at 18, 34.)  Green was legally parked at the strip mall when he was detained and searched.  (*Id.* at 25.)  There were no weapons or contraband found on his person at the

31

time of the search.  (*Id.* at 26.)  However, approximately $4,693 in cash was found on his

person.  (*Id.* at 31).  The vehicle was not searched, although officers may have looked for

anything in plain view.  (*Id.* at 26.)

Green was detained at around 1:34 p.m. and brought back to the Burnsville

Residence in order to serve the search warrant for the residence.  (*Id.* at 18-19.)  The

Bentley driven by Green at the time of his stop was driven back to the Burnsville

Residence by another Minneapolis Police officer, Officer Muro.  (*Id.* at 20.)  Officer

Werner testified that the Bentley was driven back to the Burnsville Residence in order to

get everybody back to the scene, as they were short of officers to execute the warrant and

needed officers to do so, and officer safety issues existed if they left the vehicle parked in

a parking lot, as officers did not know if Green was going to meet anybody for a drug

transaction.  (*Id.* at 18-19.)  On cross-examination, Officer Werner testified that this was

a fluid, rapid investigation, which had been going on for a while, and that officers did not

know what was in the vehicle, which was going to be seized and subject to a search

warrant at some point.  (*Id.* at 28.).  He also testified that if the vehicle was left at the strip

mall, officers were unsure who Green was going to meet or if anyone would come to take

possible contraband away from the vehicle.  (*Id.* at 28.)  Officer Werner noted that he was

aware of evidence regarding Green's alleged actions as a medium- to high-sale heroin

dealer and the large amount of cash found on his person, so there was a concern that he

was meeting someone at the strip mall for a drug transaction.  (*Id.* at 31.)  There was no

search warrant for the vehicle when the vehicle was driven back to the Burnsville

Residence to preserve possible evidence.  (*Id.* at 31, 35.)  Officer Werner further testified

that at the time of the arrest of Green and the return of the Bentley to the Burnsville

Residence (by Officer Muro) nothing had been seized from that vehicle. (*Id.* at 29.) He

was also unaware of any search of the vehicle. (*Id.* at 31-32.)

Officer Werner also testified that he participated in the execution of the search

warrant of the Burnsville Residence, during which he discovered mailings and documents

in Green's name, a sock that contained approximately $1,500 in cash, a safe in which

$196,000 in cash was discovered, and some pills. (*Id.* at 21-22.) During the search,

Officer Schmitt showed Officer Werner the drugs he had discovered at the Burnsville

Residence. (*Id.* at 22.)

Sergeant Lucas Peterson of the Minneapolis Police Department testified that he

was aware that Green had been taken into custody at approximately 1:30 p.m. on July 8,

2019, and that by 1:39 p.m., he and other officers were executing the search warrant for

the Burnsville Residence. (*Id.* at 39.) Sergeant Peterson was the first to enter the

Burnsville Residence. (*Id.* at 39-40.) The search warrant authorized the seizure of cell

phones. (*Id.* at 41.) According to Sergeant Peterson, the search of the Burnsville

Residence yielded several cell phones, a digital scale, $196,000, and a large amount of

heroin. (*Id.* at 43-44.) Sergeant Peterson also testified that he knew it was Green's

residence because there were countless pictures of him and Minnie Loyd in the bedroom,

it contained Green's entire wardrobe, Green may have told officers that he lived at the

residence, and surveillance showed him coming and going from the residence using a

key. (*Id.* at 56.)

Sergeant Peterson testified that after the heroin and cash had been found, he

decided to impound the four vehicles at the residence in order to obtain search warrants for them and to allow for safe search of the vehicles off-site from the Burnsville Residence. (*Id.* at 45-46, 48, 57.) These vehicles included an Audi SUV, a Porsche SUV, a BMW, and the Bentley that had been brought back to the residence by Officer Muro. (*Id.* at 45-48.) Sergeant Peterson testified that he performed a quick inventory search of the Bentley prior to its tow to ensure there was no weapon or evidence that would affect the tow driver. (*Id.* at 48-49.) Sergeant Peterson discovered three cell phones during his search in the center console of the vehicle. (*Id.* at 49; Def. Ex. 8.) The inventory search took approximately a minute. (Dkt. 348 at 49.) Sergeant Peterson testified that based on his understanding, the cursory or inventory search as defined by policy would involve the common areas of the vehicle, making sure that there was no evidence that was in plain sight or view or anything that would harm somebody, as compared to an "extremely extensive" probable cause search or a search under a search warrant authorized by a judge. (*Id.* at 52.) Sergeant Peterson testified on cross-examination that he only conducted an inventory search of the Bentley. ( *Id.* at 59.) However, he did not know if the other officers conducted an inventory search of the other three vehicles before they were towed. (*Id.* at 60.)

Sergeant Peterson acknowledged that he told Officer Schmitt that the phones from the Bentley had been seized from Green's person and had a vague recollection that someone may have told him that they were taken from his person, although Sergeant Peterson acknowledged that they had been taken from the Bentley. (*Id.* at 51.) Sergeant Peterson also testified that Officer Osuji was tasked with doing the inventory sheets. (*Id.*

at 65.)  The inventory sheet for the Bentley provided that the vehicle was being

impounded based on a weapons/task force hold.  (Def. Ex. 9.)  No property was listed on

the inventory sheets for the Bentley or the Audi (although the sheet noted damage on the

vehicle).  (Def. Exs. 9, 10.)  The BMW inventory states only "Misc" as to property and

described damage to the vehicle, along with the fact that pictures had been taken.  (Def.

Ex. 11.)  The Porsche inventory sheet states "Misc 2 Jackes" as to property and lists

damage to the vehicle.  (Def. Ex. 12.)

### 2.    Automobile Exception and Validity of Inventory Search

Green argues that the three cell phones were improperly seized from his Bentley

without a warrant, as the July 8, 2019 Search Warrant only authorized the search of his

person and the Burnsville Residence, and that any assertion that they were properly

seized as part of an inventory search ignores the fact that inventory was merely a pretext

for an investigatory search, as evidenced by the fact that the phones were not listed in

inventory sheet created for the Bentley, as required by Minneapolis Police policy.  (Dkt.

350 at 32-34.)

The Government argues, in part, that the warrantless search of the Bentley

yielding the three cell phones was appropriate under the automobile exception.  (Dkt. 351

at 17.)  Searches without a warrant are per se unreasonable, subject to a few well-

established exceptions, which includes an automobile exception.  *See United States v.*

*Hill*, 386 F.3d 855, 858 (8th Cir. 2004).  "The automobile exception to the Fourth

Amendment allows police officers to conduct a warrantless search of a vehicle if, at the

time of the search, they have probable cause to believe that the vehicle contains

contraband or other evidence of a crime." *United States v. Brown*, 550 F.3d 724, 727 (8th Cir. 2008) (internal quotation marks omitted); *see also United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) ("Under the automobile exception to the warrant requirement, officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the car contains contraband or other evidence."). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)). The Supreme Court has explained that the reason for this exception lies in the lower expectation of privacy in vehicles and their unique mobility. *See California v. Carney*, 471 U.S. 386, 390-91 (1985).

Here, officers had sufficient probable cause to conduct a warrantless search of the Bentley. When Sergeant Peterson seized the three phones (at 3:07 p.m.), he had already ordered that all of the vehicles be towed (at 2:11 p.m.) and the plan was to obtain a search warrant for the vehicles. (Dkt. 348 at 44-49.) In addition, Sergeant Peterson testified that he was aware that Green had been taken into custody at approximately 1:30 p.m. on July 8, 2019, and that by 1:39 p.m., he and other officers were executing the search warrant for the Burnsville Residence. (Dkt. 348 at 39, 43.) Sergeant Peterson also testified that he decided to impound the Bentley only after the discovery of the contraband inside the Burnsville Residence, including the large amount of heroin and cash. (Dkt. 348 at 43-46, 48, 57.) Based on all of the information that officers had gathered during the

investigation, as well as the discovery of a large amount of drugs and cash in the Burnsville Residence, Green's connection to the residence, and the discovery of a large amount of cash on Green's person at the time of the initial stop of the Bentley, the Court concludes that officers had sufficient probable cause to believe that evidence of drug trafficking, including cell phones, which are recognized as tools of the drug trade, would be found in the Bentley. *See United States v. Eggerson*, 999 F.3d 1121, 1125 (8th Cir. 2021). While officers could not search the cell phones themselves without a search warrant, the search of the Bentley—and the attendant seizure of the cell phones in order to preserve evidence—was valid under the automobile exception to the warrant requirement. *See also Riley*, 573 U.S. at 388-91 (finding that cell phone may be seized and secured to prevent destruction of evidence without a warrant).

In the alternative, the Government asserts that the three cell phones were properly discovered as part of an inventory search of the Bentley prior to its tow to the impound lot so that a search warrant could be obtained. (Dkt. 351 at 18.) Green counters that the evidence is unequivocal that the police used the inventory search exception as a post-hoc pretext for an investigative rummaging of Green's vehicle in light of the fact that the phones discovered were not included in any inventory as required by Minneapolis Police policy. (Dkt. 350 at 34-35.)

"Inventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment." *United States v. Morris*, 915 F.3d 552, 556 (8th Cir. 2019) (cleaned up). "It is well-settled law that a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to

secure and protect vehicles and their contents within police custody." *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) (cleaned up); *see also Morris*, 915 F.3d at 556; *Kennedy*, 427 F.3d at 1143 (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)). "They may be protecting themselves from claims of lost or damaged property **or from any potential danger posed by the unknown contents of the vehicle**." *United States v. Rowland*, 341 F.3d 774, 779 (8th Cir. 2003) (emphasis added) (citation omitted). "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." *Kennedy*, 427 F.3d at 1143. Inventory searches that are "conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." *Id.* (cleaned up). Standardized police procedures are "necessary to ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence." *Id.* (cleaned up).

The Court concludes the search of Green's vehicle was a reasonable inventory search given the totality of the circumstances. According to Minneapolis Police policy:

> The purpose of an inventory search is to protect property in the vehicle, to **ensure that the vehicle does not contain harmful or dangerous weapons or other items that would endanger the safety of officers or the public**, and to protect the department against false claims of loss or damage.

(Gov't Ex. 13 at 3.) Moreover, the policy allows for impoundment in order to preserve possible evidence within a vehicle. (*Id.* at 2.)

Sergeant Peterson testified he decided to impound the four vehicles at the residence in order to obtain search warrants and to allow for safe searching of the

vehicles off-site from the Burnsville Residence after narcotics and a large amount of cash had been discovered in the residence.  (Dkt. 348 at 45-48.)  Sergeant Peterson testified that he performed a quick inventory search of the Bentley prior to its tow to ensure there was no weapon or evidence that would "affect the tow driver."  (Dkt. 348 at 48-49, 57-58.)  This comports with the Minneapolis Police policy as a valid basis for the search.  *See United States v. Marshall*, 986 F.2d 1171, 1175-76 (8th Cir. 1993) ("The police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity. . . . Thus, when the police conduct inventory searches according to such standardized policies, they may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their **sole** purpose is not to investigate a crime.") (emphasis added) (citations omitted); *see also United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007) ("Even if the officer suspects he might uncover evidence in a vehicle, the police can still tow a vehicle and inventory the contents, as long as the impoundment is otherwise valid.") (cleaned up).

The Court now turns to Green's arguments regarding the officers' failure to follow the policy regarding towing inventories.  Green points to the fact that the phones at issue were never included on the inventory report for the Bentley.  (Dkt. 350 at 35.)  Green also notes similar deficiencies as to the other vehicles.  (*Id.*)  Green relies on *United States v. Taylor*, 636 F.3d 461 (8th Cir. 2011), where the court concluded that "the inventory was merely a pretext for an investigatory search."  *Id.* at 465.  The Court finds *Taylor* to be distinguishable because an officer testified that "the basis for the traffic stop, the arrest,

the towing of the vehicle, and the inventory search was the officer's belief that Taylor had narcotics in his vehicle." *Id.* The officer "also testified that she would not have arrested Taylor, impounded his vehicle, or inventoried the contents of the truck if not for her belief that the vehicle contained evidence of a narcotics crime." *Id.* Here, the officers had detained Green pursuant to an existing search warrant, not pursuant to a pretextual traffic stop. Further, as set forth above, and unlike in *Taylor*, Sergeant Peterson had made the decision to obtain a search warrant for all of the vehicles and testified that the point of the cursory search of the vehicle (lasting for a minute) was to essentially protect the tow truck driver.[7]

Moreover, a "failure to follow standard procedures does not ineluctably render a search unreasonable." *United States v. Morris*, 995 F.3d 665, 670 (8th Cir. 2021) (citation omitted) (dealing with a failure to provide the required reports pursuant to police policy). "Rather, '[t]here must be something else; something to suggest the police raised the inventory-search banner in an after-the-fact attempt to justify a simple investigatory

---

[7]     The Court also finds the other cases Green relies on distinguishable for similar reasons. (Dkt. 350 at 35-36.) In *United States v. Barraza-Maldonado*, the government failed to introduce evidence of the Minnesota State Patrol inventory-search policy that law enforcement was allegedly following, and the troopers already suspected that there were drugs in the vehicle before they searched it. 879 F. Supp. 2d 1022, 1033 (D. Minn. 2012), *aff'd on other grounds*, 732 F.3d 865 (8th Cir. 2013) (inventory search issue not raised). In *United States v. Caskey*, law enforcement did not testify as to why certain items were in plain view or describe the search sufficiently to determine if it complied with the policy. No. CRIM. 11-301 JRT/LIB, 2013 WL 50450, at *5 (D. Minn. Jan. 3, 2013). Finally, in *United States v. Reed*, the impound and tow were not consistent with permissible reasons for impound and towing listed in the relevant policy, and the government provided no other reason for the impound and tow. 319 F. Supp. 3d 1112, 1121-22 (S.D. Ind. 2018).

search for incriminating evidence.'" *Id.* (quoting *United States v. Nevatt*, 960 F.3d 1015, 1020 (8th Cir. 2020) (per curiam), quoting *United States v. Smith*, 715 F.3d 1110, 1117-18 (8th Cir. 2013)).  In *Morris*, the Eighth Circuit concluded that suppression was not warranted as to the inventory search even though the officer failed to properly fill out a report as a required by policy.  *See id.*  Here, the Court finds the failure to include the cell phones and other evidence in the inventory log sheets for the four vehicles as required by policy does not warrant suppression.  Sergeant Peterson testified that the searches were conducted in order to protect the tow truck driver.  This testimony along with the fact that the search was short and cursory and the vehicles were being impounded to permit a thorough search pursuant to a search warrant indicates that the inventory search was not a pretext to discovering incriminating evidence.  Moreover, it does appear that the officers attempted to use the logs as required given that the logs set forth the existing damage to the vehicles.  In short, the "something else" beyond failing to follow the towing inventory procedure is missing here, and so, even if the officers did fail to follow the policy in some respects, the Court will not invalidate the searches of the vehicles on this basis alone.

The Government also argues that the cell phones would be admissible under the inevitable discovery doctrine.  (Dkt. 351 at 22-23.)  Under the inevitable discovery doctrine, evidence need not be suppressed if the Government can prove by a preponderance of the evidence that: "(1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."  *United States v. Thomas*, 524 F.3d 855, 859 (8th

Cir. 2008) (citing *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998)).

Here, the record shows that there was, at a minimum, a reasonable probability that cell phones located in the center console of the Bentley would have been obtained pursuant to the search warrant obtained for the Bentley that the Court has concluded is supported by probable cause. (*See infra*, Section II.F.) Accordingly, the Court finds that the inevitable discovery doctrine applies, and recommends denial of the Motion to Suppress on that ground as well.

### 2.    Probable Cause: Search Warrant for the Three Cell Phones

Green argues that there is no probable cause for the issuance of the search warrant for the three phones seized from the Bentley, as the only connection between Green and the Burnsville Residence in the supporting affidavit is a single mention of him leaving the residence, and the affidavit does not connect Green to drug trafficking or Loyd. (Dkt. 350 at 30-32.) The Government asserts that the search warrant was supported by sufficient probable cause, especially in light of the significant connection between cell phones and drug dealing, and in the alternative argues that the *Leon* exception applies. (Dkt. 351 at 19-20.)

Officer Schmitt's July 9, 2019 supporting application asserts the following basis, in part, for the issuance of the search warrant for three cell phones found in the Bentley:

- On July 8, 2019, officers executed a search warrant at the Burnsville Residence, which was based on an investigation into Green's heroin distribution.

- Green was stopped in his Bentley after leaving the Burnsville Residence.

- The cell phones at issue were recovered from Green

- The search warrant at the Burnsville Residence yielded 298.8 grams of Heroin and cash proceeds in the amount of $196,921.

- Green was booked into Dakota County Jail on felony narcotics charges.

(Gov't Ex. 9.)

The Court finds that the warrant application contains sufficient information from which a reasonable person could conclude that there was evidence of a crime located in the cell phones at issue. The affidavit set forth facts establishing narcotics activities and tied them to the Burnsville Residence, as well as to Green. While Green asserts that the warrant application does not tie him to the Burnsville address and that there was no timely evidence regarding any suspected drug activity (Dkt. 350 at 36-37), the warrant application states that Green and Loyd had been under investigation for narcotics activities related to the Burnsville Residence; the investigation of Green's narcotics activities led to the search warrant for the Burnsville Residence; and during the July 8, 2019 execution of the search warrant for the Burnsville Residence, officers discovered 298.8 grams of heroin, as well as cash proceeds in the amount of $196,921. Moreover, the application states that Green was booked into Dakota County Jail on felony narcotics charges.

With respect to cell phones, the Eighth Circuit has found as follows:

We note first that cell phones are now so widespread as to be ubiquitous. *See Riley*, 573 U.S. at 395, 134 S. Ct. 2473. There is no reason to suspect that drug dealers are any less likely than regular people to have and use a cell phone. *See, e.g., United States v. Williams*, 976 F.3d 807, 810 (8th Cir. 2020); *United States v. Denson*, 967 F.3d 699, 703 (8th Cir. 2020). In fact, given the nature of the business and the need for easy and instantaneous communication with buyers, drug dealers may be even more likely to use cell

> phones. If firearms are "tool[s] of the [drug] trade," as we have often said, there is little reason to believe that cell phones are not. *United States v. Fuentes Torres*, 529 F.3d 825, 827 (8th Cir. 2008) (citation omitted).

*Eggerson*, 999 F.3d at 1125. Given that the search warrant application ties Green to criminal activity, the evidence of which had recently been seized from the Burnsville Residence, and that he had been arrested on narcotics charges, coupled with the ubiquitous nature of cell phones and drug trafficking, the Court finds that the search warrant for the cell phones seized from the vehicles on the day of Green's detention by police is supported by the requisite probable cause. Even to the extent that probable cause was lacking, the Court further concludes that officers had a good faith basis to rely on the warrant in searching the cell phones under the *Leon* exception, especially in light of the fact that the search warrant for the Burnsville Residence based on Green's alleged activities yielded such a large amount of narcotics and cash and that the phones were seized from Green contemporaneously with that search. Consequently, the Court recommends denial of the Motion to Suppress with respect to the cell phones.

## F.    July 9, 2019 Search Warrant for the Four Vehicles (Gov't Ex. 10)

Green seeks suppression of a July 9, 2019 Search Warrant related to the Bentley he was arrested in on July 8, 2019, as well as a Blue Audi Q7, a BMW, and a Porsche Cayenne that were found at the Burnsville Residence as part of the execution of the July 2019 Warrant for the Burnsville Residence. (Dkt. 350 at 36.) Green argues that the search of the vehicles should be suppressed on the basis that they are the fruit of the warrantless search of the vehicles occurring on July 8, 2019 and on the basis that the

warrant is not supported by sufficient probable cause.[8]  (*Id.* at 36-37.)  The Government

counters that given that the vehicles are associated with the Burnsville Residence, where

298 grams of heroin and over $196,000 in cash had been found on July 8, 2019, the

search warrant for the vehicles is supported by sufficient probable cause.  (Dkt. 351 at

23.)  In the alternative, the Government argues that the *Leon* good-faith exception would

apply to the officers executing the search warrant.  (*Id.*)

Officer's Schmitt's July 9, 2019 supporting application asserted the following

basis for the issuance of the search warrant for the subject vehicles:

> GREEN and Minnie Kokeisha LOYD (DOB [ ]) have been previously
> observed during surveillance conducting narcotics related activities.  Those
> activities ultimately resulted in the search warrant in Burnsville.
>
> Affiant believes that GREEN is a mobile narcotics dealer who utilizes
> technology such as a cell phone to conduct narcotics sale.  Additionally,
> GREEN has used a variety of motor vehicles, some of which have been
> identified above as well as rental vehicles to conduct the transport and sale
> of narcotics.
>
> Based on my training, experience, and upon conversations with other law
> enforcement officers, I know that those involved in the transport, sale and
> distribution of narcotics often conceal and store items such as narcotics and
> firearms in their motor vehicles.  It has been my experience that this is done
> with vehicles that are further secured in garages as well as vehicles parked
> outside.
>
> On February 13, 2019, GREEN had been observed driving the Porsche
> Cayenne.
>
> On July 8, 2019, your affiant executed a search warrant at 1170 McAndrews

---

[8]     It is unclear to the Court how the warrantless searches of the vehicles infected the
search warrant, as they are not mentioned in the application, and there is no evidence that
the decision to obtain the search warrant had anything to do with those searches.
Regardless, for the reasons stated above, the Court has concluded that the warrantless
searches were proper.

Road East in Burnsville Minnesota. This search warrant was based off on the investigation into Kevin Termell GREEN (DOB [ ]). GREEN was being investigated for distributing heroin in the City of Minneapolis. GREEN was stopped leaving the address in Burnsville while driving an unlicensed black Bentley sedan. Located on the driveway of the town home at XXXX McAndrews Road East was a Blue Audi Q7, Minnesota license plate CSEXXX which law enforcement had a tracker installed on. In the garage was a BMW with IL license plate AGXXXXX. Parked in the lot of the town home complex was a previously identified Porsche Cayenne, Minnesota license plate BZMXXX. These vehicles were impounded to the Minneapolis Police secured forensics lot.

GREEN and Minnie Kokeisha LOYD (DOB [ ]) have been previously observed during surveillance conducting narcotics related activities. Those activities ultimately resulted in the search warrant in Burnsville.

Affiant believes that GREEN is a mobile narcotics dealer who utilizes technology such as a cell phone to conduct narcotics sale. Additionally, GREEN has used a variety of motor vehicles, some of which have been identified above as well as rental vehicles to conduct the transport and sale of narcotics.

Based on my training, experience, and upon conversations with other law enforcement officers, I know that those involved in the transport, sale and distribution of narcotics often conceal and store items such as narcotics and firearms in their motor vehicles. It has been my experience that this is done with vehicles that are further secured in garages as well as vehicles parked outside.

On February 13, 2019, GREEN had been observed driving the Porsche Cayenne, Minnesota license plate BZMXX while conducting narcotics related activities. GREEN has also been observed driving the Audi Q7, Minnesota license plate CSEXXX as has Minnie LOYD while conducting narcotics related activities.

Prior to July 4, 2019 GREEN had been utilizing a variety of rental vehicles. GREEN was believed to be in Illinois based on facebook monitoring during the time of July 1 and 2 of 2019. It is unknown if GREEN drove to Illinois, however the BMW with Illinois license plates had not been seen prior to the search warrant on July 08, 2019. The Bentley with temporary tags had not been seen prior to July 8, 2019 either.

It is believed that GREEN utilizes vehicles to conduct the sale and transport

of heroin.

The search warrant at the address of XXXX McAndrews Road East in Burnsville led to the recovery of 298.8 grams of Heroin. Cash proceeds were recovered in the amount of 196,921 dollars in US Currency.
Also located in the residence was multiple shooting targets that had been used as noted by bullet holes in the targets. GREEN and LOYD were both booked into Dakota County Jail on felony narcotics charges.

GREEN has a 2007 controlled substance felony conviction and is therefore prohibited from possessing a firearm.

(Gov't Ex. 10.)

The Court finds that the warrant application contains sufficient information from which a reasonable person could conclude that there was evidence of a crime located in the vehicles at issue. The application set forth facts establishing narcotics activities and tied them to the Burnsville Residence, as well as to Green. While Green asserts that the warrant application does not tie him to the Burnsville Residence and that there was no timely evidence regarding any timely suspected drug activity (Dkt. 350 at 36-37), the warrant application states that Green and Loyd had been under investigation for narcotics activities related to the Burnsville Residence, that the investigation of Green's and Loyd's narcotics distribution activities led to the search warrant for the Burnsville Residence, and that during the July 8, 2019 execution of the search warrant for the Burnsville Residence, officers discovered of 298.8 grams of heroin, as well as cash proceeds in the amount of $196,921.

As to the vehicles, the warrant application either connects the vehicles to the Burnsville Residence where narcotics were found or to Green, including: that Green had been observed driving the Porsche on February 13, 2019 and it was located in the parking

lot of the townhome complex on July 8, 2019 during the execution of the search warrant

for the Burnsville Residence; the Blue Audi Q7 that had been the subject of a tracking

warrant as part of the investigation was found in the driveway of the Burnsville

Residence during the July 8, 2019 execution of the search warrant for the residence; and

Green had been stopped leaving the address of the Burnsville Residence driving the

Bentley sedan on July 8, 2019.  With respect to the connection of the vehicles to the

Burnsville Residence, it is important to note that "a vehicle found on a premises (except,

for example, the vehicle of a guest or other caller) is considered to be included within the

scope of a warrant authorizing a search of that premises."[9] *United States v. Pennington*,

287 F.3d 739, 745 (8th Cir. 2002) (cleaned up).  In other words, the location of the

vehicles provides an important connection between the vehicles and the evidence of

narcotics found at the Burnsville Residence.  Moreover, Officer Schmitt represented in

the warrant application that based on his training and experience, and upon conversations

with other law enforcement officers, those involved in the transport, sale, and distribution

of narcotics often conceal and store items such as narcotics and firearms in their motor

vehicles, and that this is done with vehicles that are further secured in garages as well as

vehicles parked outside.  *See United States v. Oliver*, No. CR 16-258 (DSD/BRT), 2016

---

[9]     Green singles out the BMW to assert that it could have been a guest's vehicle.
(Dkt. 350 at 37.)  However, given that the vehicle was located inside of the garage of the
Burnsville residence, the Court finds that common sense indicates the BMW belonged to
an occupant of the suspect residence.  In any event, assuming that this was a guest's
vehicle, Green has not shown or provided any evidence how he would have standing to
challenge the search of the vehicle.  *See United States v. White*, 962 F.3d 1052, 1054 (8th
Cir. 2020).

WL 11186991, at *6 (D. Minn. Dec. 28, 2016) (noting that an officer's training and experience is relevant to a finding of probable cause), *R.&R. adopted*, 2017 WL 187142 (D. Minn. Jan. 17, 2017), *aff'd*, 950 F.3d 556 (8th Cir. 2020).

For all of these reasons, the Court concludes that the issuing judge had a substantial basis for concluding that probable cause existed that the subject vehicles contained evidence related the distribution of narcotics.

Because the search warrant was supported by probable cause, the Court need not determine whether the *Leon* good-faith exception should apply. However, even if the warrant lacked probable cause, the Court notes that officers' reliance on the warrant would have been reasonable under *Leon*.

> Under the [*Leon*] good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable. The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization.

*United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (alterations in original) (internal quotations omitted).

*Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid. *Id.* (citation omitted). With respect to the third exception, the Eighth Circuit explained: "'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words." *Proell*, 485 F.3d at 432 (quoting *United States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003)).

In this case, the Court does not find that the application was intentionally or recklessly misleading, or that the issuing judge wholly abandoned his judicial role in issuing the search warrant. As to the remaining exceptions, the Court has already concluded that the warrant application provided an adequate factual basis for the issuing judge to have found probable cause. Therefore, based on all the facts and circumstances of this case, it was not "entirely unreasonable" for law enforcement officers to rely on the issuance of the search warrant for the vehicles.

## G.    Tracking Warrant for the Blue Audi Q7

Green also seeks suppression of a June 13, 2019 tracking warrant for the Blue Audi Q7 (Gov't Ex. 8). The application for the tracking warrant provides the following basis for its issuance, in relevant part:

- Officer Schmitt learned of a narcotics dealer who uses the street name of "Stunna". The information was obtained via a SCALES interview during the course of a narcotics arrest. "Stunna" was said to be a large scale supplier of Heroin. During the course of the interview the arrested party stated they had been in a Porsche SUV with "Stunna" · and purchased 100 grams of heroin. "Stunna" was said to often drive a Porsche SUV that was Rose in color.

- Officer Schmitt determined that "Stunna" was named Kevin Termell GREEN, DOB [ ].  It was further learned that his girlfriend used the social media name of Minnie Betty Jean.

- Surveillance was established in the area of Franklin Ave and Nicollet Ave searching for a target of a separate narcotics investigation during which affiant noted a Rose-colored Porsche SUV drive down the alley and into the back parking lot of XXXX Blaisdell Ave that registered to a Minnie Loyd.

- A comparison of photographs confirmed that Minnie Loyd was the same individual a Minnie Betty Jean.

- Officer Schmitt was able to physically observe and identify Kevin Termell GREEN, Rose-colored Porsche SUV driving this vehicle. GREEN was observed travelling to multiple locations and meeting with three different persons for short periods of time.  The locations included XXXX Blaisdell Ave S where GREEN pulled into the back parking lot and met with a male.  GREEN then drove to Winnetka and Highway 55 in Golden Valley where he left his vehicle running in the traffic lane of the parking lot in front of Pancheros restaurant while he met with a male in a vehicle.  Green then drove to Mickey's Liquor in Plymouth Ave N and Emerson Ave N where he met with another person in a vehicle.

- These interactions in Officer Schmitt's experience are indicative of narcotics transactions.

- Officer Schmitt was able to gather information from a CRI who is familiar with the Porsche SUV.  The CRI has provided intel that the driver of the Porsche is running heroin distribution in Minneapolis and employs people to sell narcotics for him.  GREEN has been identified as running surveillance from the Porsche SUV while supervising the sale of heroin on the streets.  At one point a CRI identified a male known as "BLACK" driving a Dodge van with MN license plate BREXXX waiting at a location in the City of Minneapolis.  The CRI stated heroin users were lined up and waiting for BLACK to sell them heroin.  The CRI said the Porsche pulled up, tossed a bag to "BLACK" in the driver's seat of the van and a feeding frenzy of heroin transactions occurred.  The CRI stated that it was a pound of heroin. The van BREXXX also registered to Minnie Loyd.

51

- On 04/17/2019, Surveillance was conducted on GREEN. Affiant observed GREEN exit the home on XXXX McAndrews Road in Burnsville. This was the first time he has visually been observed at the address he is believed to live at. GREEN got into the passenger seat of a Red Chevrolet Camaro with Kentucky license plate 085XXX. The vehicle's license plate was run and found to be a rental vehicle.

- Officer Schmitt identified a Blue Audi Q7 Sport with no license plates at the XXXX McAndrews Road address. Green and Loyd have been observed driving that vehicle in Hennepin Co. On 06/13/2019, Affiant identified the vehicle again but this time it had Minnesota license plate CSEXXX affixed to the vehicle. The vehicle is now registered in the name of Minni Loyd. Minni Loyd is believed to be a coconspirator in GREEN's activities as the two are often seen together.

(Gov't Ex. 8.)

Green's argument is that an issuing court cannot determine that the information gleaned from the *Scales* interview or the surveillance of a Porsche SUV is current; that the affidavit fails to provide information from which the issuing judge can independently determine that "Stunna" is Kevin Green or that Minnie Betty Jean is his girlfriend; that there is no information that the "intel" provided by the CRI is based on personal knowledge, not rumor and innuendo; that while "Green has been identified as running surveillance from the Porsche SUV while supervising the sale of heroin on the streets," the application does not say how he was identified, by whom, or when; that there is no information connecting the Audi Q7 to drug dealing; and that the affidavit lacked any information as to why Minni Loyd is a co-conspirator. (Dkt. 350 at 38.)

The Court finds that the search warrant contains sufficient information tying Green to drug trafficking activity (including the use of vehicles with respect to drug

trafficking), tying Loyd to the instrumentalities of drug dealing such as the vehicles involved in trafficking, and tying them both to the Audi Q7 in that both had been seen driving the vehicle and the vehicle is registered to Loyd. While it is unclear, Green seems to be asserting that probable cause is lacking because Officer Schmitt did not include in the application a statement that the CRI directly witnessed the drug transaction involving Green and "BLACK." However, given that the issuing judge found probable cause, "[a] court must review the sufficiency of a search-warrant affidavit using a 'common sense' and not a 'hypertechnical' approach." *Grant*, 490 F.3d at 632. Here, the CRI gave a play-by-play of the drug interaction that is consistent with an eye-witness account, from which a neutral judge could infer that the CRI witnessed the drug transaction based on all of the circumstances.[10]

However, the Court agrees that the application for the tracking warrant suffers from a lack of dates connected to the alleged drug activities. The only dates provided are: that on April 19, 2019, an officer observed Green exit the Burnsville Residence; that Green and Loyd were seen in the Audi sometime before June 13, 2019; and that on June 13, 2019, officers identified the license plate affixed to the Audi and determined that the Audi was now registered to Loyd. That said, as set forth with respect to the tracking

---

[10]   In any event, even assuming that an explicit statement that "the CRI saw" (or similar) was required, the Government has asserted the *Leon* exception. (Dkt. 351 at 24.) Here, in the affidavit supporting the search warrant for the Burnsville Residence, Officer Schmitt stated that the CRI **observed** the transaction at issue between "BLACK" and Green (Gov't Ex. 7 (December 4, 2019 Hearing) at 2-3). Given this knowledge, the Court finds that Officer Schmitt had a good faith basis to execute the tracking warrant even though the words indicating the CRI saw or observed the transaction were not contained in the tracking application at issue. *See Jackson*, 784 F.3d at 1231.

warrant for the 612-263-12XX cell phone number (*supra*, Section II.B), Officer Schmitt stated in his July 2019 Affidavit for the Search Warrant for the Burnsville Residence (Gov't Ex. 7 (December 4, 2019 Hearing)) that the *Scales* interview took place on January 31, 2019.  *See Jackson*, 784 F.3d at 1231 (citation omitted) (finding that courts need to consider the totality of the circumstances, "including any information known to the officer but not included in the affidavit").  This was corroborated at the May 6, 2021 hearing by Officer Schmitt when he testified that he first became aware of a large-scale heroin dealer named "Stunna" on January 31, 2019 from a *Scales* interviewee.  (Dkt. 338 at 56-57, 66.)  Officer Schmitt further testified that this was the first time he had been made aware of "Stunna" and that the investigation of this individual began.  (*Id.* at 56-57, 66, 112.)  Moreover, Officer Schmitt stated in the search warrant application for the Burnsville Residence that the CRI observed the transaction at issue between "BLACK" and Green on March 4, 2019.  (Gov't Ex. 7 at 2-3 (December 4, 2019 Hearing)).  Given the information in Officer Schmitt's possession regarding the dates that are missing from the affidavit for the Audi tracking warrant, and the fact that "in investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale," *Formaro*, 152 F.3d at 771, this Court finds that Officer Schmitt had a good faith basis to rely on the tracking warrant issued for the Audi with respect to staleness.  On this basis, the Motion to Suppress with respect to the tracking warrant for the Audi should be denied.

### III.   MOTION FOR RELIEF FROM PREJUDICIAL MISJOINDER OR, IN THE ALTERNATIVE, FOR SEVERANCE

Green moves pursuant to Federal Rule of Criminal Procedure 8(b) to sever Counts 5 and 6, gun charges brought against codefendants Abari (Count 5) and Relondo Devon Hall (Count 6), from the remaining counts for trial on the grounds that they have been misjoined.  (Dkt. 266.)  Alternatively, Green asserts that this Court should exercise its discretion under Federal Rule of Criminal Procedure 14 to sever Counts 5 and 6 on the ground that a joint trial of these counts, including the allegations that Abari and Hall are ten-time felons (in the aggregate), who have committed multiple crimes of violence and drug offenses, will unduly prejudice his case.  (Dkt. 261 at 2.)

Green concedes that Counts 1-4 of the Superseding Indictment are properly joined, even though Green is not charged in Counts 2 and 3, and Abari and Hall are not charged in Count 4, as Count 1 charges a drug conspiracy which allegedly existed between December 2018 and July 8, 2019 and Counts 2-4 allege individual drug possessions by one or more of these Defendants, which allegedly were in furtherance of the alleged conspiracy of Count 1.  (*Id.* at 4.)  However, Green argues that Counts 5 and 6, alleging possession of firearms by Abari and Hall, contain no allegation that the firearms were used or possessed in connection with the Count 1 conspiracy.  (*Id.* at 4-5.)  Green asserts that the fact that his codefendants were allegedly found in possession of firearms during the same period as the Count 1 conspiracy is insufficient to sweep those allegations into the conspiracy.  (*Id.* at 5.)

The Government counters that contrary to Green's argument that Counts 5 and 6 are unrelated to the drug conspiracy, the Eighth Circuit has frequently observed that a firearm is a "tool of the trade" for drug dealers and the guns were recovered from Green's co-conspirators during the same incidents which make up the substantive counts of the conspiracies (January 24, 2019 and April 14, 2019). (Dkt. 271 at 9-10.)

Rule 8 of the Federal Rules of Criminal Procedure states:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

(b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8.

"Where an indictment joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule 8(b), rather than Rule 8(a)." *United States v. Mann*, 701 F.3d 274, 289 (8th Cir. 2012) (citing *United States v. Jones*, 880 F.2d 55, 60-61 (8th Cir. 1989)). The language of Rule 8(a) does not allow joinder on the same basis as 8(b), as the words "same or similar character" are omitted from 8(b). *Id.* Therefore, "[f]or offenses to be properly joined in an indictment that also joins defendants, the offenses must be part of 'the same series of acts or transactions.'" *Id.* "Generally, the 'same series of acts or transactions' means acts or transactions that are pursuant to a common plan or a common scheme." *Id.* (citation omitted); *see also United States v.*

56

*Wadena*, 152 F.3d 831, 848 (8th Cir. 1998) (citation omitted) ("Generally, the 'same series of acts or transactions' means acts or transactions that are pursuant to a common plan or a common scheme.").

Here, the Superseding Indictment has the offenses related to the possession of firearms by Abari, as set forth in Count 5, occurring on January 24, 2019, the same date he is alleged to have been in possession with the intent to distribute controlled substances in the form of Fentanyl, which also contained a detectable amount of heroin as set forth in Count 2 of the Superseding Indictment.  (Dkt. 250 at 2, 4.)  Similarly, the Superseding Indictment charges Hall with possession with the intent to distribute Fentanyl with heroin on April 14, 2019, the same date he was found in possession of a firearm leading to the charge in Count 6 for being a felon in possession.  (*Id.* at 3, 5.)  The conspiracy to distribute controlled substances in Count 1 is alleged to have occurred from least December 2018 and continuing through July 8, 2019 by Defendants dealing with the distribution of heroin and Fentanyl.  (*Id.* at 1-2.)  Given that the possession of the firearms appears to be in conjunction with the underlying narcotic charges making up the conspiracy in Count 1, the same dates of the underlying Counts as set forth above, and that firearms are known tools of the drug trade, *see United States v. McVay*, 996 F.3d 845, 849 (8th Cir. 2021) ("Consistent with our case law, the district court found that firearm possession by Harding can be considered part of drug trafficking because firearms are tools of the drug trade."), the Court finds that the felon in possession of weapons charges against Abari and Hall were properly joined in the same indictment with the charge of conspiracy to distribute narcotics.

Once offenses have been properly joined, the Court may order separate trials of the counts if joinder "appears to prejudice a defendant or the government . . . ." Fed. R. Civ. P. 14(a). However, the Eighth Circuit has held that it reads Rules 8 and 14 in favor of joinder, and the presumption against severing properly joined cases is strong. *See United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996). Green objects to a joint trial on the counts because he believes the jury will unfairly associate him with evidence from incidents that are unrelated to the events he was involved in—the underlying offenses leading to Hall and Abari allegedly having felony convictions. However, "[s]everance is not required merely because evidence which is admissible only against some defendants may be damaging to others." *Id.* Indeed, the risk of prejudice posed by joint trials is best cured by careful and thorough limiting instructions to the jury. *Id.* at 1144 (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). Speculative allegations of prejudice do not amount to the "showing of real prejudice" required before severance is mandated. *See United States v. Finn*, 919 F. Supp. 1305, 1324 (D. Minn. 1995) (in denying motion to sever, court stated that "we have not been presented with any cogent showing that the evidence at trial will be so complex or confusing that . . . a jury will be disposed to cumulate the evidence against each defendant"); *see also United States v. Garrett*, 961 F.2d 743, 746 (8th Cir. 1992) (defendant "must make a showing of real prejudice by demonstrating that the jury was unable to compartmentalize the evidence") (quoting *United States v. Givens*, 712 F.2d 1298, 1300 (8th Cir. 1983)).

Here, Green has only offered boilerplate statements of potential prejudice dealing with being associated by the jury with convicted felons. Such conclusory statements that

he will suffer prejudice are insufficient.  Moreover, Green has not shown that an appropriate limiting instruction will not sufficiently alleviate the prejudice related to his co-defendants' criminal records.  Therefore, Green's motion to sever counts should be denied.

## IV.    <u>RECOMMENDATION</u>

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.    Defendant Kevin Green's Motion to Suppress Evidence Obtained as a Result of Search and Seizure and for Franks Hearing (Dkt. 258) be **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.    The Motion to Suppress be **GRANTED** as to the February 15 Warrant and supporting application related to obtaining a tracking warrant for a 2004 rose-colored Porsche Cayenne SUV; and

      b.    The Motion to Suppress be otherwise **DENIED**.

2.    Defendant Kevin Green's Motion for Relief from Prejudicial Misjoinder or, in the Alternative, for Severance (Dkt. 266) be **DENIED**.

DATED: August 26, 2021            *s/Elizabeth Cowan Wright*
                                   ELIZABETH COWAN WRIGHT
                                   United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).