UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                      **MEMORANDUM OF LAW & ORDER**
                          Criminal File No. 19-00103 (3) (MJD)

KEVIN GREEN,
a/k/a Chuck, a/k/a Stunna,

        Defendant.

Katharine T. Buzicky, Assistant United States Attorney, Counsel for Plaintiff.
Kevin Green, pro se.

## I.    INTRODUCTION

This matter is before the Court on Defendant Kevin Green's Pro Se Motion to Vacate Under 28 U.S.C. § 2255. (Doc. 672.) Green asserts claims of ineffective assistance of counsel. The Government responded and Green filed a timely reply. (Docs. 700, 702.)[1] On October, 20, 2025, Green filed an untimely "Motion Addendum 2255." (Doc. 703.) The Court rejects this late filing and does not consider the arguments contained therein.

---

[1] Despite being called a "Pro Se Reply to Response" and being mailed by Green from his BOP facility, it appears that Docket No. 702 was mostly written by advocates at Lawyers Paralegal Services, LLC ("LPS"). (See Doc. 696 at 8-9 (explaining how LPS previously filed documents on Green's behalf).)

1

## II. BACKGROUND

Green and codefendants Anthony Abari and Relondo Hall were part of a narcotics conspiracy that forms the basis of this case.

### A. The January 2019 Search of the Sixth Street Apartment

In late 2018, Minneapolis police were investigating the overdose death of a woman who purchased drugs from Hall. (Trial Tr. Vol. 1 at 57-58; Trial Tr. Vol. 2 at 199.) Officer Brandon Noble learned that Hall had been dealing drugs out of an apartment on Sixth Street Southeast in Minneapolis. In January, 2019, Noble obtained a search warrant for the apartment. (Trial Tr. Vol. 1 at 59-60; Doc. 697-1 (Search Warr. Appl. (Abari Ex. 1).) Although officers seized guns, cash, cell phones, and approximately 100 grams of heroin mixed with fentanyl during their search, Hall and Abari continued to traffic drugs as evidenced by Abari's texts from just a few days after execution of the warrant asking Green for more drugs and responding to customers who were seeking drugs. (Gov. Ex. 277 at 14-19.)

### B. Investigation of Green and Search of Minnie Loyd's House

In mid-March 2019, Abari, Hall, and Green met at a BP gas station in Minneapolis, where Green supplied Abari and Hall with heroin laced with fentanyl in exchange for a gun and some cash. (Trial Tr. Vol. 4 at 470, 526-28.)

2

This was the last time the three of them were together in their capacity as coconspirators. In April 2019, Abari was arrested during the execution of another search warrant and has been in custody ever since.

Green, however, continued his illegal activities and law enforcement continued investigating. In July 2019, police searched the home of Green's girlfriend, Minnie Loyd. (Trial Tr. Vol. 5 at 832-33.) Officers seized approximately 298 grams of heroin mixed with fentanyl; a money counter; a digital scale; and $190,302 in cash, which was found in a safe in the primary bedroom closet. (Id. at 833-42, 858, 864.) The total amount of cash seized from the safe, Green's person, and Lloyd's purse totaled $196,921. (Id. at 864.) During the search, officers also found documents pertaining to a contact of Green's named Jaleesha Slaughter. (Id. at 851-52, 918.) In a custodial interview, Green denied connection to the drugs found in the home and also unequivocally denied that Loyd had any connection to the drugs. (Gov't Ex. 301.)

### C.    The Charges

Hall, Green, and Abari were charged in a second superseding indictment on a variety of drug and firearm charges. Green was charged in two counts of the indictment: possession with intent to distribute and conspiracy to distribute.

Paul Rogosheske was first appointed to represent Green, but in May 2020, the Court granted Rogosheske's motion to for leave to withdraw and appointed Robert Richman to represent Green. (Doc. 234.)

### D. Trial and Sentencing

Hall pleaded guilty, cooperated with the Government, and testified at the ten-day January 2022 trial of Green and Abari. Several law enforcement witnesses testified and some of Abari and Hall's customers testified, as well as other witnesses. Near the end of the Government's case-in-chief, the parties realized there was a discrepancy between the number of bags of fentanyl seized from Loyd's home. (Trial Tr. Vol. 8 at 1287-89, 1303-10.) One witness, Sergeant John Biederman, documented 53 bags, and another witness, BCA chemist Sara Goldstrand, documented 54 bags. (Id. at 1287-89.)

Richman's defense theory was that another drug dealer named Leon Mooney was responsible for the offenses charged against Green. Richman used cross-examination to "create[] a connection between Leon Mooney and Minnie Loyd." (Id. at 1146.) Richman noticed Loyd and Mooney as defense witnesses but did not call either of them to testify during the defense case. (Doc. 378.) Richman also planned to call Jaleesha Slaughter at trial. Slaughter "was

4

prepared to testify that during the relevant period in 2019, she was living with Kevin Green at a different address in Burnsville." (Trial Tr. Vol. 8 at 1327.) However, when it came time for Slaughter to testify, she refused to appear. Richman told the Court that Slaughter "is under subpoena" but "has disappeared" and could not be located. (Id.)

The jury found Green guilty of (1) conspiracy to distribute 400 grams or more of mixtures and substances containing a detectable amount of fentanyl and (2) possession with intent to distribute 40 grams or more of a mixture and substance containing a detectable amount of fentanyl. (Doc. 469.)

Green's sentencing hearing was held on August 17, 2022. Under the Sentencing Guidelines, Green's total offense level was 34, his criminal history category was III, and his imprisonment range was 188 – 235 months. (Doc. 560 at 1.) Green contested several issues in the PSR. Therefore, the hearing included an evidentiary hearing regarding the quantity of drugs for which Green was responsible, among other things. Slaughter testified at the hearing that Green lived with her from April to June 2019. (Doc. 574 (Evid. Hr'g Tr.) at 7-10.) Richman subpoenaed Loyd to testify, but she refused to do so, invoking her Fifth Amendment right against self-incrimination. Richman instead called defense

investigator Julie Davison to testify about her interview of Loyd. (Id. at 15-22.) Davison testified that Loyd told her Green did not live with her, only stayed at her house "once in a rare while," and that Green had nothing to do with the safe seized during the search of the house. (Id. at 22.) According to Loyd, the safe belonged to another man whom Loyd had been dating. (Id. at 21.)

The Court sentenced Green to 180 months in prison followed by 10 years supervised release. (Doc. 559.) In the Statement of Reasons, the Court stated that "[e]ven taking everything Slaughter said as true, this says nothing about where Defendant lived on July 8, 2019 when law enforcement" searched Loyd's house. (Doc. 561 at 6-7.) The Court further found that although Davidson testified truthfully, the story Loyd told her was "too incredible to merit any weight." (Id. at 8.) There was just too much evidence that Green lived at Loyd's house. (Id.)

### E.   Appeal

On appeal, Richman argued the Court erred when it denied Green's request for a jury instruction on multiple conspiracies and that there was insufficient evidence to prove he possessed the drugs in Loyd's house. United States v. Green, 83 F.4th 696, 703-05 (8th Cir. 2023). The Eighth Circuit rejected the arguments and affirmed Green's conviction. Id. at 705.

## III. DISCUSSION

### A. Standard for Relief under 28 U.S.C. § 2255

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice. A movant may not raise constitutional issues for the first time on collateral review without establishing both cause for the procedural default and actual prejudice resulting from the error.

United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996) (citation omitted).

Alternatively, a procedural default can be excused if a defendant demonstrates that he is actually innocent. Bousley v. United States, 523 U.S. 614, 622 (1998).

A petitioner is entitled to an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

[A] petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to

7

> relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.

Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995) (citations omitted).

### B.     Ineffective Assistance of Counsel Standard

To gain relief for ineffective assistance of counsel, Defendant must establish both (1) that his counsel's performance "fell below an objective standard of reasonableness," and (2) that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 688, 692 (1984). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687. The Court "need not address the reasonableness of the attorney's behavior if the movant cannot prove prejudice." Apfel, 97 F.3d at 1076.

The ineffective-assistance standard is "a most deferential one" that must be applied "with scrupulous care." Harrington v. Richter, 562 U.S. 86, 105 (2011). It is "all too tempting to second-guess counsel's assistance after conviction or adverse sentence." Id. (citation omitted). The question is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Id. (quoting Strickland, 466 U.S. at 690).

8

### a) Performance

To show that his counsel's performance was deficient, a defendant must show that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. "An attorney is not incompetent in exercising reasonable professional judgment even when, in hindsight, the decision may have been a mistake." Thomas v. United States, 737 F.3d 1202, 1207 (8th Cir. 2013) (citations omitted). Counsel's performance is deficient if it falls outside of the "wide range of reasonable professional assistance," although there is a strong presumption that counsel's conduct falls within this broad spectrum. Strickland, 466 U.S. at 689; Chambers v. Armontrout, 907 F.2d 825, 828 (8th Cir. 1990) (a deficient performance is "less competent than the assistance that should be provided by a reasonable attorney under the same circumstances") (citations omitted). An attorney's performance is not tested in isolation. Jackson v. United States, 956 F.3d 1001, 1006 (8th Cir. 2020). Instead, the Court must "assess how the error fits into the big picture of what happened at trial." Id. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Davis v. United States, 858 F.3d 529, 534 (8th Cir. 2017) (quoting Strickland, 466 U.S. at 689 (emphasis omitted).)

### b) Prejudice

A defendant must show that his attorney's deficient performance actually prejudiced him. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Speculation about a possible alternative outcome does not satisfy this standard. See Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989) (holding that speculation about what witnesses might have said falls short). The defendant bears the burden to establish a "reasonable probability that, but for counsel's unprofessional errors, the result would have been different." Strickland, 466 U.S. at 694.

### C.  Green's § 2255 Motion to Vacate Sentence

As a basis for the Court to vacate his sentence, Green asserts three claims of ineffective assistance of counsel against Richman: (1) Richman was ineffective regarding "formal plea offers" and plea negotiations; (2) Richman was ineffective

regarding potential exculpatory witnesses; (3) Richman was ineffective on appeal because he did not pursue a chain of custody claim.

### 1. Whether Richman was Ineffective Regarding Formal Plea Offers and Plea Negotiations

Green argues that Richman was ineffective with respect to plea negotiations and plea offers from the Government. (Doc. 666 at 8-19.) Green states that Richman orally described two possible plea scenarios to him prior to trial. (Doc. 667-1 ¶¶ 3-4.) Green rejected the first offer and wanted to counter the second. (Id.) Green claims Richman did not tell him if he conveyed the counteroffer to the Government. (Id. ¶ 4.) Green asserts that on the eve of trial, he told Richman that he wanted to accept a plea agreement, but that "Mr. Richman told [him] the prosecution was no longer interested in a plea agreement." (Id. ¶ 5.) Green states, "On belief and information, the prosecution actually proposed a plea offer for 5-40 years in response to my request on the eve of trial. Mr. Richman did not convey this offer to me." (Id.) He states that he would have accepted such an offer. (Id. ¶ 6.) Thus, Green claims that Richman knew about an eve-of-trial deal for a recommended 5-40-year sentence and never mentioned it to Green.

11

Defense counsel "has the duty to communicate formal offers from the prosecution . . . that may be favorable to the accused" to his client. Missouri v. Frye, 566 U.S. 134, 145 (2012). Counsel who allows "the offer to expire without advising the defendant or allowing him to consider it, . . . [does] not render the effective assistance the Constitution requires." Id.

The Court finds Green's claim speculative, at best. He uses the words "on belief and information" five times in his brief in support of this argument. (Doc. 666 at 2, 12, 13, 16.) Green also states that his claims are based on "belief and information and subject to clarification during this proceeding," which sounds like a wish for a Court-authorized fishing expedition. (Id. at 12, 13.) Without any kind of evidence to the contrary, the facts before the Court do not support this claim. Richman had previously presented two plea offers to Green. The Court does not find it credible that Richman would fail to convey a third plea offer on the eve of trial. The Court is not required to accept allegations as true if they are "inherently incredible," as these allegations are. Engelen, 68 F.3d at 240.

Green states that he was prejudiced by Richman's error because he would have accepted the plea offer if it had been presented to him. Conclusory statements about wishing to plead guilty do not suffice to demonstrate

12

Strickland prejudice.  Hudson v. United States, 139 F.4th 1011, 1014-15 (8th Cir. 2025).  This claim is inherently incredible, given Green's stance during the three years between indictment and trial.  A defendant who maintains his innocence throughout the criminal process but alleges after trial that he would have accepted a plea usually cannot show prejudice under Strickland.  See Sanders v. United States, 341 F.3d 720, 723 (8th Cir. 2003); Engelen, 341 F.3d 720, at 241 (denying relief where record was "completely barren" of any indication the defendant would have admitted guilt prior to trial).

A defendant who denies guilt at arrest, expresses a consistent desire to go to trial, and otherwise maintains innocence "at all stages" of his prosecution while showing no indication he is willing to accept guilt, undermines his later § 2255 claim.  Sanders, 341 F.3d at 723.  In addition, a defendant who maintains innocence post-trial may also lack credibility.  See Engelen, 68 F.3d at 241.

Here, not only did Green maintain his innocence through the trial, his post-trial assertions undermine his current claim.  Green further maintained his innocence throughout the appeal process and is still doing so in his brief in support of this motion.  Green speculates that Mooney "was responsible for the drugs and money found" at Loyd's house.  (Doc. 666 at 24.)  Thus, Green has

13

failed to meet his burden to "present some credible, non-conclusory evidence that he would have pled guilty had he been properly advised." Sanders, 341 F.3d at 723 (quotation omitted). This part of Green's motion is denied.

### 2. Whether Richman was Ineffective Regarding Exculpatory Witnesses

Green argues that Richman's "performance was deficient in failing to contact, interview, obtain the presence at trial and offer testimony from the potential exculpatory witnesses which Mr. Green brought to former counsel's attention." (Docs. 666 at 21; 702 at 4.) Defendant refers to potential witnesses Loyd, Slaughter, and Mooney. Green asserts that the case against him "was built on assumptions, speculation, and conjecture," and that had Richman "developed and presented the available testimony" of Loyd, Slaughter, and Mooney, there was a "reasonable probability" of acquittal. (Doc. 666 at 24, 25.) Green does not state what these potential exculpatory witnesses would have testified to, but he does state that it was just as likely, if not more so, that Mooney was the person responsible for the contraband found in Loyd's house. (Id. at 24.) Green acknowledges that Slaughter testified at sentencing and that Loyd invoked her Fifth Amendment rights at sentencing, but appears to argue that Slaughter would have testified differently during trial than at sentencing. (Id. at 23 n.10.)

14

When a defendant claims his attorney failed to investigate or call his witnesses, the defendant must identify which "witnesses were available, how they would have testified, and why such additional evidence would likely have affected the result" of the trial. Delgado v. United States, 162 F.3d 981, 983 (8th Cir. 1998). Mere speculation that a "witness might have testified that [Green] was innocent. . . . is simply inadequate to undermine confidence in the outcome" of the trial. Sanders, 875 F.2d at 210 (emphasis in original).

Green fails to satisfy his burden to show that Richman was ineffective regarding exculpatory witnesses. First, Richman included Loyd, Slaughter, and Mooney on his witness list. (Doc. 378 at 1.) At trial, Richman planned to call Slaughter, whom he had subpoenaed, and provided a detailed description of her expected testimony. (Tr. Trans. Vol. 8 at 1327.) However, Slaughter had "disappeared." (Id.) The Court thus understood that Slaughter was not there because she did not want to be. (Id. at 1328.) This was not due to any failure on Richman's part. Therefore, the motion is denied as to Slaughter.

The motion is also denied as to Loyd and Mooney. Green has not provided the kind of detail necessary to overcome the deferential standard by which Richman's actions are reviewed. See Harrington, 562 U.S. at 105. Green's

arguments regarding their potential testimony are, at most, cursory—stating that because the case against Green was flimsy, it was just as likely, if not more so, that Mooney was responsible for the contraband found at Loyd's house, but never explaining what Loyd or Mooney would testify to that would make that connection clear. (See Doc. 666 at 24.) Green also states that the Government's witnesses had "credibility issues" that effective rebuttal testimony from exculpatory witnesses would have answered. (Id. at 24-25.) Again, there is no explanation of what Government witnesses had issues and what rebuttal testimony Green proposed would counter them. This Circuit requires more. See Sanders, 875 F.2d at 210. Green has failed to establish a "reasonable probability that, but for counsel's unprofessional errors, the result would have been different." Strickland, 466 U.S. at 694. This part of Green's motion is also denied.

### 3. Whether Richman was Ineffective on Appeal

Green claims that Richman was ineffective on appeal for failing to assert a claim about discrepancies in the chain of custody regarding the number of bags of fentanyl seized from Loyd's home, 53 or 54. (Doc. 672 at 6.) He argues that the chain of custody was broken because officers had to take the bags back to be tested a year later after Green was indicted. (Id.) He notes that the Government was even trying to get Ms. Goldstrand, the person who tested the heroin for the

16

BCA and whose bag count differed from Sgt. Biederman's count, back to Court for redirect examination at the very end of trial.  (Doc. 702 at 6.)[2]  Green states, "Judge Davis himself believed this was going to be a problem on appeal."  (Id.)

While Green had the right to decide whether to appeal, he did not have the right to decide what points to raise on appeal.  Jones v. Barnes, 463 U.S. 745, 751 (1983).  Review of appellate counsel's performance is "particularly deferential" where, as here, a defendant argues "counsel failed to raise an additional issue on direct appeal." Charboneau v. United States, 702 F.3d 1132, 1136 (8th Cir. 2013).  "[A]bsent contrary evidence," a court assumes that when appellate counsel does not raise a claim, it was "an exercise of sound appellate strategy."  United States v. Brown, 528 F.3d 1030, 1033 (8th Cir. 2008) (quoting Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998)).  To that end, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal. . . ." Jones, 463 U.S. at 751.  Applying these standards, the Court holds that Green's claim fails.  Richman, an experienced criminal defense lawyer, raised two issues on appeal, but did not raise the one that Green now proposes.

---

[2] The Court notes that pages 1-5 of Docket No. 702 appear to have been written by advocates at LPS and pages 6 and 7 were written by Green.

The Court assumes that Richman's choices were made in "an exercise of sound appellate strategy." Brown, 528 F.3d at 1033. This part of the motion is denied.

### D. Green is not Entitled to an Evidentiary Hearing

Green requests an evidentiary hearing to hear testimony from Green, his former counsel, and witnesses who did not testify at trial. (Doc. 702 at 2.) After a thorough review of Green's claims, the Court finds that the motion and files of the case "conclusively show that the prisoner is not entitled to relief" and therefore, Green's petition can be dismissed without an evidentiary hearing. 28 U.S.C. § 2255(b); Engelen, 68 F.3d at 240.

### E. No Certificate of Appealability Shall Issue

Because the basis upon which the Court dismisses is not fairly debatable, a certificate of appealability ("COA") will not issue in this matter. See 28 U.S.C. § 2253(c)(2) (defendant is entitled to a COA "only if [he] has made a substantial showing of the denial of a constitutional right"); Slack v. McDaniel, 529 U.S. 473, 478 (2000) (a COA must issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right").

Accordingly, the Court will not issue a certificate of appealability.

**IV.   ORDER**

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendant Kevin Green's Pro Se Motion to Vacate Under 28 U.S.C. § 2255 **[Doc. 672]** is **DENIED**;

2. The Court will not hold an evidentiary hearing in this matter; and

3. No certificate of Appealability shall issue.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 27, 2025                s/Michael J. Davis
                                       Michael J. Davis
                                       United States District Court